**METRO CABLE CO., a Delaware corporation, Plaintiff,**

v.

**CATV OF ROCKFORD, INC., an Illinois corporation, et al., Defendants.**

No. 72 C 68.

United States District Court, N. D. Illinois, W. D.

April 12, 1974.

Richard M. Calkins and William N. Braun of Burditt & Calkins, Chicago, Ill., for plaintiff.

George L. Saunders, Jr., Thomas J. Houser, Theodore N. Miller, R. Eden Martin, Frederic J. Artwick of Sidley & Austin, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

BAUER, District Judge.

This cause comes on the defendants' motion to dismiss the second amended complaint because it fails to state a

claim upon which relief can be granted, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

This action seeks to redress alleged violations of the federal antitrust laws, specifically Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2. This Court allegedly has jurisdiction over the action under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26.

Plaintiff, Metro Cable Company ("Metro") was chartered as a Delaware corporation on April 1, 1964, and prior to February 1, 1972, had the corporate name of Rockford Community Television, Inc. Metro operates a CATV system serving Loves Park, North Park Community and unincorporated areas of Winnebago County, Illinois, and is owned by local individual and business interests in the Rockford, Illinois, area. Defendant CATV of Rockford, Inc. ("CATV of Rockford") is an Illinois corporation, with its principal place of business located in Rockford, Illinois, and is presently installing a CATV system in parts of the City of Rockford, Illinois. Defendant Rock River Television, Inc. ("WCEE-TV") is an Illinois corporation, engaged in the business of television broadcasting with its principal place of business located in Rockford, Illinois. Defendant Harley Swanson is the President and a stockholder of CATV of Rockford, and is also Director of WCEE-TV. Mr. Swanson assists in the direction and operation of CATV of Rockford in the manner alleged herein. Defendant David S. Paddock is the Secretary and a stockholder of CATV of Rockford as well as the Secretary and a stockholder of WCEE-TV. Mr. Paddock assists in the direction and operation of CATV of Rockford and WCEE-TV. Defendant Earl W. Hickerson is the General Manager and a stockholder of CATV of Rockford and is Vice-President, General Manager and a stockholder of WCEE-TV. Hickerson assists in the direction and operation of CATV of Rockford and WCEE-TV. Defendant Harley W. Mullins is the Treasurer and a stockholder of WCEE-TV and a stockholder of CATV of Rockford. Mullins assists in the direction and operation of WCEE-TV. Defendant Benjamin T. Schleicher is the Mayor of the City of Rockford, Illinois. Defendant Dale M. Skolrood is an Alderman of the City Council of the City of Rockford, Illinois, and a former Chairman of the Planning and Finance Committee of that Council.

The plaintiff, in its amended complaint, alleges, *inter alia,* the following facts:

1. Defendant WCEE-TV is engaged in the commerce of disseminating broadcasting television signals, many of which originate outside the State of Illinois. Plaintiff, as the owner and operator of a CATV system in Loves Park, North Park Community and in unincorporated areas in Winnebago County, Illinois, receives television signals and FM by means of multiple antennae mounted on a high tower and then converts, processes and amplifies the signals, originates additional signals, and distributes them by cable to the premises of subscribers who pay a monthly fee for the service. Plaintiff's system offers the signals of all three local television stations and some independent educational television stations (both UHF and VHF) from Chicago, Illinois, and Madison, Wisconsin, and will offer the signals from other television stations originating both in Chicago, Illinois, and outside the State of Illinois. Defendant CATV of Rockford intends to offer similar signals to that of the plaintiff which will originate both from Chicago, Illinois, as well as from outside the State of Illinois. Plaintiff is in competition with WCEE-TV in the Loves Park—North Park Community—Winnebago County—suburban Rockford areas for viewing customers. Plaintiff has been for in excess of eight years, in competition with CATV of Rockford for a license from the City of Rockford, Illinois, to construct and expand its system into the City of Rockford, which is requisite to seeking viewing customers. Competition for the viewing customers in the City of Rockford, Illinois, now generates, and in

the future will continue to generate, in excess of a million dollars per year.

2. Commencing sometime in 1964 or 1965, the exact date of which is unknown to plaintiff, and continuing uninterruptedly up to and through the date of the complaint, the defendants have combined, contracted and conspired among themselves, to restrain interstate trade and commerce and to monopolize commerce in violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2. In furtherance of these violations, defendants have combined, contracted and conspired among themselves to boycott and foreclose the plaintiff from entering the (a) CATV market and (b) television market in Rockford, Illinois, and in certain unincorporated areas of Winnebago County, Illinois, thereby eliminating plaintiff as a potential competitor of the defendant WCEE-TV in said city and obtaining and maintaining for CATV of Rockford a total monopoly of the CATV industry in Rockford, Illinois. The defendant WCEE-TV's primary objective in entering and maintaining this conspiracy was effectively to foreclose any further competition in the television market in Rockford, Illinois. To this end, it and its stockholders were instrumental in creating CATV of Rockford for the purpose of obtaining a CATV franchise, and blocking the plaintiff as a potential competitor which was necessary to defendant WCEE-TV because it was a new entrant into the TV media market as of September, 1965.

3. In order to foreclose further television competition, including CATV competition, in Rockford, Illinois, the defendant WCEE-TV, by and through its officers, directors and stockholders, kept control of CATV of Rockford, the only corporation that was granted a franchise to build a cable system in Rockford. Through this control, WCEE-TV was able to determine when and in what areas of Rockford, Illinois, cable television would be introduced in Rockford, Illinois. Individuals owning or controlling

approximately 65% of the capital stock of WCEE-TV own or control over 60% of the capital stock of CATV of Rockford. Every officer and director of WCEE-TV is also an officer, director, or stockholder in CATV of Rockford. Every officer and director of CATV of Rockford is also an officer, director or stockholder of WCEE-TV. The Vice-President and General Manager of WCEE-TV is also the General Manager of CATV of Rockford. As a result, there is 100% cross-management and 100% cross-corporate control between WCEE-TV and CATV of Rockford.

4. Pursuant to the above conspiracy and to accomplish the objectives sought, defendants have committed the following acts with the predatory intent and purpose of eliminating plaintiff as a viable competitor:

a. Defendants CATV of Rockford, WCEE-TV, Swanson, Paddock, Hickerson and Mullins met in 1965 and agreed to take steps to prevent plaintiff from obtaining a franchise from the City Council of Rockford, Illinois, to operate a CATV system in that city.

b. Defendant Mullins met with the defendant Schleicher, Mayor of the City of Rockford, on or about March 12, 1965, and numerous times thereafter, and obtained from him an agreement that the latter would take steps to foreclose plaintiff from obtaining a franchise from the City Council. Defendant Mullins, in exchange for this agreement of the defendant Schleicher, paid him a substantial sum of money as a "campaign" contribution for his reelection.

c. Subsequently, a similar agreement was entered into with the defendant Skolrood, an alderman who was Chairman of the Planning and Finance Committee, and other parties as yet unknown. A substantial sum of money was also paid to the defendant Skolrood as a "campaign" contribution.

d. In 1965 and 1966, defendant Swanson succeeded in obtaining an agreement from defendant Schleicher, and subsequently, a similar agreement from defendant Skolrood, whereby Schleicher and Skolrood agreed to, and did, use their best efforts to foreclose plaintiff from obtaining a CATV franchise from the City of Rockford.

5. As a result of the conspiracy between all defendants, including the defendants Schleicher and Skolrood, plaintiff was foreclosed from obtaining a CATV franchise or from even obtaining a hearing on its merits before the City Council, which was necessary in order to obtain a valid franchise. The following occurred:

a. On April 5, 1966, the License Committee of the Rockford City Council recommended that plaintiff Metro be granted a franchise for cable television in view of the fact that it could have an operative system installed within two years. However, CATV of Rockford was awarded the franchise on April 14, 1966, because of pressure brought on the Council by defendant Schleicher who was acting pursuant to his agreement with the other defendants.

b. On October 19, 1970, the plaintiff again applied for a cable franchise for the City of Rockford and deposited the sum of $100,000.00 with the Rockford City Treasurer guaranteeing to start construction of a quality cable television system within the corporate limits of Rockford within 6 months after the City approved the construction plans for said system, at which time plaintiff submitted a legal opinion to the City of Rockford from outside independent legal counsel of Chicago, Illinois, wherein the defendants Schleicher and Skolrood were advised that the City of Rockford could not grant an exclusive franchise for cable television. Subsequently, defendants Schleicher and Skolrood refused to grant plaintiff even a hearing on its petition for a second franchise notwithstanding said legal opinion.

c. On October 26, 1970, the defendants Swanson and Paddock on behalf of themselves and the defendant corporation CATV of Rockford, willfully misrepresented unto the Planning and Finance Committee of the City Council of the City of Rockford, of which the defendant Skolrood was a member, that CATV of Rockford had expended $100,000.00 to purchase a parcel of land south and east of Elgin, Illinois, and had constructed a tower on said premises for the purpose of receiving and transmitting microwave signals for cable television to Rockford when in fact it was the defendant WCEE-TV which purchased said land and erected said tower. Notwithstanding said willful misrepresentation and fully knowing the same to be a misrepresentation, the defendant Skolrood refused the plaintiff a hearing on its application for a cable franchise for the City of Rockford.

d. In September, 1971, plaintiff filed a third application for a cable license and, even though the Rockford Assistant City Attorney rendered a legal opinion that the City had no right to grant an exclusive CATV franchise to the defendant CATV of Rockford, yet the City Council again refused to grant even a hearing on plaintiff's application. Furthermore, the Planning and Finance Committee, headed by the defendant Skolrood, appointed a subcommittee chaired by Alderman David Ingrassia and with Skolrood as a participating member of said subcommittee, for the publicly announced purpose of establishing hearing procedures to be followed by the City Council in

awaiting a second franchise under the February 12, 1972 rules of the Federal Communications Commission but which subcommittee subsequently, contrary to its procedural instructions, decided in a secret meeting to conduct no hearings on the matter and to allow only CATV of Rockford to operate its CATV system in the City of Rockford.

e. On May 8, 1972, at the insistence of the defendants, Skolrood voted not to grant any additional franchises in the City of Rockford.

f. The defendant Schleicher, on February 4, 1972, executed a certificate under oath which contained false information and was filed before the Federal Communications Commission; said certificate stated that a public proceeding has been held by an appropriate committee of the Rockford City Council as required by Federal Communications Commission Regulations, when in fact no such public proceeding and no examination of financial or other qualifications had ever been held on the application of CATV of Rockford for a CATV franchise in the City of Rockford.

g. The plaintiff, which now operates a cable television system in portions of the unincorporated areas of Winnebago County, has attempted to extend its cable system to Rock Valley College, Rockford College, other public schools located in unincorporated areas of the county and certain individual homes located in said unincorporated areas. To reach said schools and individual homes, it is necessary in certain areas to erect its cables on utility poles some of which are located within the City of Rockford's corporate limits. To facilitate the erection of said cables, the plaintiff in May, 1972, applied to the City of Rockford for authorization to erect its cables on utility poles located within the corporate limits of the City of Rockford so as to extend plaintiff's cable to Rock Valley College, Rockford College, other schools located in unincorporated areas of the county and to certain homes located in unincorporated areas of the county guaranteeing that no homes within the corporate limits of the City of Rockford would be serviced by said cables. On May 23, 1972, the Planning and Finance Committee of the City of Rockford, of which the defendant Skolrood was a member and present, held a subcommittee meeting on plaintiff's petition. At said meeting the defendant Paddock, representing himself and the defendant CATV of Rockford, admitted that the plaintiff had the right to extend its cables to any unincorporated area in the County of Winnebago, but in furtherance of the conspiracy herein pleaded opposed said petition and willfully misrepresented to said Planning and Finance Committee that Illinois Bell Telephone Company had lines available for the transmission of television signals across the incorporated areas of the City of Rockford for the plaintiff when in fact no such telephone lines were or are now available, and as a result of said misrepresentation and as a result of the influence of the defendants Skolrood and Schleicher, the City of Rockford refused the plaintiff the authorization to erect its cable on any utility poles located within the City of Rockford.

h. Notwithstanding the fact that the defendant CATV of Rockford may not legally operate a cable television system within the City of Rockford without a Certificate of Compliance issued by the Federal Communications Commission and may not construct a cable televi-

sion system without a waiver issued by the Illinois Commerce Commission, and that the Franchise Ordinance of CATV of Rockford provides that Illinois Bell Telephone Co. will build the cable system, the City of Rockford, through the influence of Schleicher and Skolrood, and in furtherance of said conspiracy continues to allow the defendant CATV of Rockford to construct a cable system within the corporate limits of the City of Rockford, without a waiver from the Illinois Commerce Commission and in violation of the Franchise Ordinance of the City of Rockford.

i. The defendant Hickerson acting both as General Manager of WCEE–TV as well as General Manager of CATV of Rockford, controlled both said companies, and because of this control was able to use the resources and facilities of both to foreclose Metro Cable from obtaining a franchise to operate a cable television system within the City of Rockford.

The plaintiff seeks this Court to permanently enjoin the defendants from in any way interfering with plaintiff's application for a CATV franchise before the Rockford City Council in competition with the defendant CATV of Rockford and to award plaintiff three times the amount of the alleged damages suffered, or $9,000,000.00.

The defendants, in support of their motion to dismiss, contend that:

1. A governmental grant of a franchise to one applicant but not to another is not a violation of the antitrust laws.

2. The plaintiff's allegation with respect to the attempts of certain defendants to influence city council action does not bring this case under the Sherman Act's prohibition.

3. The plaintiff's allegation of cross-ownership and control is within the exclusive jurisdiction of the Federal Communications Commission which has rejected plaintiff's claim.

The plaintiff, in opposition to the instant motion, contends that the amended complaint adequately states a cause of action against the defendants.

It is the opinion of this Court that the defendants' motion is meritorious.

I. THE PLAINTIFF'S ALLEGATIONS IN ITS AMENDED COMPLAINT HAVE FAILED TO SUFFICIENTLY PIERCE THE SHIELD OF THE NOERR-PENNINGTON DOCTRINE.

The defendants contend that the Noerr-Pennington doctrine which exempts from the antitrust laws joint efforts to influence legislative or executive action, even when such efforts have the effect of eliminating competition, is applicable to the case at bar. See Eastern Railroad Presidents' Conference v. Noerr Moto Freight, Inc., 365 U.S. 127, 31 S.Ct. 523, 5 L.Ed.2d 464 (1961); United Mine Workers of America v. Pennington, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965). See also California Motor Transport Co. v. Trucking Unlimited, 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972); Semke v. Enid Automobile Dealer Association, 456 F.2d 1361 (10th Cir. 1972); Israel v. Baxter Laboratories, Inc., 151 U.S.App.D.C. 101, 466 F.2d 272 (1972).

In *Noerr* the Supreme Court permitted under the Sherman Act efforts by business men to influence legislative or executive action even if such efforts are designed to injure their competitors. A construction of the Sherman Act that would disqualify people from taking a public position on matters in which they are financially interested would deprive the government of a valuable source of information and at the same time, deprive the people of their right to petition in the very instances in which that right may be of the most importance to them. In *Pennington*, involving a suit by a small mining company against larger ones and labor unions alleging a conspiracy to influence the Secretary of

Labor to set such high rates as to force the small company out of business, the Court followed its holding in *Noerr*. It found that joint efforts to influence public officials do not violate antitrust laws even though intended to eliminate competition.

■■ Basic to *Noerr* is a belief that regulation of competition by the political process is legitimate and not proscribed by the Sherman Act, an enactment which is itself a political decision. For the political process to be effective there must be freedom of access, regardless of motive to ensure the right of people to inform their representatives in government of their desires with respect to the passage or enforcement of laws. It would be destructive of rights of association and of petition to hold that groups with common interests may not, without violating the antitrust laws, use the channels and procedures of state and federal agencies and courts to advocate their causes and points of view respecting resolution of their business and economic interest vis-a-vis their competition.

■ Where these political considerations are absent, the Noerr doctrine is inapplicable. The policies of the Sherman Act should not be sacrificed simply because defendants employ governmental process to accomplish anti-competitive purposes. Otherwise, with governmental activities abounding, the government could engineer many situations into an antitrust haven.[1] Thus there may be instances where the alleged "political action" is a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor and the application of the Sherman Act would be justified. The instant action is about politics and not about commerce or economic competition. Two CATV companies sought franchises from the Rockford City Council. One, CATV of Rockford, Inc., was successful; the other, Metro Cable Co., was not successful. The unsuccessful company has now sued the successful company on the theory that decisions by a City Council, and activities of citizens and businesses in dealing with that City Council, constitute a restraint of trade, or an attempt to monopolize under the antitrust laws. If the plaintiff's position was engrafted onto the antitrust laws it would impose upon the courts a wholly new responsibility for overseeing the political processes of state and local legislative policy-making authorities. It would require the courts to examine communications between a legislator and a citizen to determine whether coinciding views as to policy may be "conspiracies" and whether the motives of the elected representatives or their constituents in supporting some particular policy are "predatory".

The "predatory" acts alleged by the plaintiff in its complaint make it apparent that the plaintiff wants this Court to regulate political rather than economic or commercial behavior.

The alleged predatory acts consist of:

1. Meetings between representatives of the successful applicant and the Mayor and a leading Alderman; efforts by the former to persuade the latter "to use their influence" so as to cause the City Council to decide a political question in a certain way to defeat a proposal for granting a CATV franchise to Metro; and allegedly "substantial" campaign contributions.[2]

2. A recommendation by a Committee of the City Council and a decision by the City Council contrary to that recommendation.

---

1. See J. Scott, Antitrust and Trade Regulation Today, 1969, 88 (1969). S. Oppenheim and G. Weston, Federal Antitrust Laws—Cases and Comments, 160–162 (1968).

2. The evidence with respect to "substantial" political contributions apparently consists of a single $50 check to the "All Rockford Party". See Deposition of Joe M. Bairch, Vol. II, pp. 41–44, January 29, 1973.

3. Opposition by the defendants to the proposal for granting a CATV franchise to Metro, and the Council's refusal to grant such a franchise.

4. Statements made by certain defendants to a committee of the Council, which statements plaintiff alleges to be incorrect.

5. Opposition by these defendants to a proposal by plaintiff to erect its cables on utility poles and the decision by the Council not to adopt the proposal.

6. A statement contained in an affidavit which plaintiff alleges to be incorrect.

■ These so-called "predatory" acts —meetings with and statements to committees of legislative bodies seeking to influence the decisions of those bodies, and campaign contributions—are the essence of politics. The arena is the legislative forum not the market places. The object is to affect votes, not consumer decisions. Such allegations with respect to political matters totally fails to state a claim under the federal antitrust laws.

In the instant complaint there is no allegation of bringing "sham" adjudicatory proceedings of either an administrative or judicial nature. The decision to grant one franchise but not another was a policy decision made not by an adjudicatory body but by a political branch of government, namely, the City Council. Defendants apparently did not and could not, by the very legislative nature of the City Council, institute any "sham" proceedings in the City Council. Plaintiff claims it did not get a hearing by a City Council committee.[3] But a legislative committee is not like a court; it does not have to hold hearings on a legislative proposal, and its members may decide issues of policy based on considerations that are not part of a judicial or quasi-judicial record. Local government units such as City Councils and County Boards are seldom completely free from personal interest and outside influences, but the Sherman Act was not intended to regulate this type of activity. See, e. g., Sun Valley Disposal Co. v. Silver State Disposal Co., 420 F.2d 341 (9th Cir. 1969).

Further, the plaintiff has failed to specifically and sufficiently allege that the defendants were guilty of fraud, corruption or misuse of the state processes. See Semke v. Enid Automobile Dealers Association, *supra*.

Thus the plaintiff's allegations in the amended complaint have failed to sufficiently state a cause of action against the defendant which would pierce the shield of the Noerr-Pennington doctrine.[4]

3. The plaintiff incorrectly asserts that the instant action is governed by the exception to the Noerr-Pennington doctrine stated by the Supreme Court in California Motor Transport Co. v. Trucking Unlimited, 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972). However, the actions by the defendants in that case are not similar to the political actions of the defendants in the instant action. In the California Motor Transport case the defendant group had allegedly instituted the administrative and judicial proceedings and actions, with or without probable cause, and regardless of the merits of the cases. Their purpose was not to influence a policy-making function, such as the defendants in the instant action, but to bar their competitors from meaningful access to adjudicatory tribunals and to discourage and ultimately prevent the plaintiffs from invoking the processes of the administrative agencies and courts.

The California Motor Transport decision furnishes insight to what is meant by the term "sham", but in so doing it does not aid the plaintiff at bar because it has not been shown here that defendants were guilty of fraud, corruption or misuse of the state processes. See Semke v. Enid Automobile Dealers Association.

4. See, e. g., Comment "Antitrust Immunity: Recent Exceptions to the Noerr-Pennington Defense," 12 Boston College Ind. & Comm. L.Rev. 1133 (1971); Donnem, "Federal Antitrust Law Versus Anticompetitive State Regulation", 39 A.B.A. Antitrust Law Journal, 950 (1973); Note, "State Action Exemption from the Antitrust Laws" 50 B.U. Law Rev. 393 (1970).

## II. THE GOVERNMENTAL GRANT OF A FRANCHISE TO ONE APPLICANT BUT NOT TO ANOTHER DOES NOT CONSTITUTE A VIOLATION OF THE ANTITRUST LAWS.

Under Illinois law the power to grant CATV franchises within a particular municipality resides in the City Council, the local legislative representatives of that municipality.[5]

The City Council may grant no franchise, one franchise or many franchises. If the Council grants a franchise, it may fix the charge to be paid to the CATV company for providing CATV services. Without a franchise, a company may not engage in the economic competition for CATV customers.

The plaintiff in its complaint fails to adequately state a cause of action or sufficiently allege facts setting forth a claim of boycott under Section 1 of the Sherman Act or of monopolization under Section 2 of the Sherman Act.

A boycott is a concerted refusal to deal with the victim of the boycott.[6] No such refusal to deal has been alleged in the instant complaint. It is not claimed that CATV of Rockford, or any of its officers, refused to sell anything to the plaintiff or to buy from the plaintiff. Nor is it alleged that the City Council or that the Mayor and Alderman defendants refused to buy from or sell to the plaintiffs. Thus, there is no sufficient allegation of a boycott, within the meaning of Section 1 of the Sherman Act.

More specifically, the plaintiff alleges that the defendants have agreed "to boycott and foreclose the plaintiff from entering the CATV market in Rockford, Illinois. . . ."[7] Thus the charge of being "foreclose[d] from entering the CATV market" is merged with the charge of a boycott. However, the City's unwillingness to grant plaintiff a franchise is not a concerted refusal to deal or a boycott. The City is not declining to buy from or sell to the plaintiff. On the contrary the City Council is exercising its discretion by declining to grant plaintiff authority to do business.

Likewise, the plaintiff's allegation that defendants monopolized and conspired to monopolize fails to adequately state a cause of action under Section 2 of the Sherman Act. Plaintiff in its complaint asserts the theory that the granting of a franchise to CATV of

---

5. Section 11–42–11 of Chapter 24 of the Illinois Revised Statutes provides, in relevant part:

"The corporate authorities of each municipality may license, franchise and tax the business of operating a community antenna television system as hereinafter defined.

The words 'community antenna television system' shall mean any facility which is constructed in whole or in part in, on, under or over any highway or other public place and which is operated to perform for hire the service of receiving and amplifying the signals broadcast by one or more television stations and redistributing such signals by wire, cable or other means to members of the public who subscribe to such service; except that such definition shall not include (i) any system which serves fewer than fifty subscribers, or (ii) any system which serves only the residents of one or more apartment dwellings under common ownership, control or management, and commercial establishments located on the premises of such dwellings."

6. See Klor's v. Broadway Hale Stores, 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959) (certain manufacturers and distributors refused to sell to a particular retailer); Eastern States Lumber Association v. United States, 234 U.S. 600, 34 S.Ct. 951, 58 L.Ed. 1490 (1914) (retailers of lumber refused to deal with certain wholesalers in order to prevent the wholesalers from selling directly to consumers); Kiefer Stewart Co. v. Seagram & Sons, Inc., 340 U.S. 211, 71 S.Ct. 259, 95 L.Ed. 219 (1951) (manufacturers refused to supply wholesalers who would not agree to resale prices fixed by the manufacturers); United States v. Frankfort Distilleries, 324 U.S. 293, 65 S.Ct. 661, 89 L.Ed. 951 (1945) (retailers refused to buy from wholesalers or producers who will not agree to the terms of price-fixing agreements); Associated Press v. United States, 326 U.S. 1, 65 S.Ct. 1416, 89 L.Ed. 2013 (1945) (members of an association caused the association to refuse to provide services to nonmember competitors).

7. Second Amended Complaint, page 6.

Rockford but not to the plaintiff had the effect of granting CATV of Rockford "an illegal monopoly in the CATV market in Rockford, Illinois."[8] However, a successful franchise applicant does not become a monopolist because another applicant is unsuccessful. If this were the law, local governments with the power to grant licenses for franchises would violate the Sherman Act every time they granted a first license or franchise. The obtaining of permission to do business is not monopolization. It is what the competitor may do after it is in business that may constitute monopolization. See United States v. Grinnell Corp., 384 U.S. 563, 86 S.Ct. 1698, 16 L. Ed.2d 778 (1966); United States v. Du Pont & Co., 351 U.S. 377, 76 S.Ct. 994, 100 L.Ed. 1264 (1956); American Tobacco Co. v. United States, 328 U.S. 781, 66 S.Ct. 1125, 90 L.Ed. 1575 (1946).

To a degree monopoly power is the power to control prices or exclude competition. See United States v. Du Pont & Co., *supra*. In the instant complaint there is no allegation that CATV of Rockford and the other defendants have the ability to control prices. There is no allegation in the instant complaint that CATV of Rockford can control prices at will. The defendants contend that the charge to subscribers is fixed by the ordinance granting CATV of Rockford a franchise, and that charge may not be altered without the consent of the City Council.[9] There is no sufficient allegation in the amended complaint that CATV of Rockford and the other defendants have the economic power to exclude competition.

The power to franchise and hence the power to control competition in the cable television market, under the relevant Illinois statute, resides entirely within the City Council of Rockford.

The City Council's decision to grant a franchise to CATV of Rockford but not to Metro does not violate the antitrust laws because those laws do not reach restrictions imposed by an instrumentality or agency of the state. See Parker v. Brown, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943). Nothing in the language of the Sherman Act or its history suggests that its purpose was to restrain a state or its officers or agents from activities directed by the legislature. The Sherman Act makes no hint that it was intended to restrain state action or official action directed by a state. There is no suggestion in the Act's legislative history of a purpose to restrain state action.

In *Parker*, the Supreme Court sustained a raisin marketing program established by an agency of the State of California on the grounds that the antitrust laws do not apply to activities directed by agencies of the state. Courts have repeatedly reaffirmed this principle. See, e. g., United Mine Workers of America v. Pennington, *supra*; Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc., *supra*; E. W. Airways, Inc. v. Massachusetts Port Authority, 362 F.2d 52 (1st Cir. 1966); Miley v. John Hancock Mutual Life Insurance Co., 242 F.2d 758 (1st Cir. 1957), cert. denied, 355 U.S. 828, 78 S Ct. 38, 2 L.Ed.2d 41 (1958). The teaching of *Parker* is that the antitrust laws are directed against individuals and not state action. When a state has a public policy against free competition in an industry important to it, the state may regulate that industry in order to control or, in a proper case, to eliminate competition therein. It may even permit persons subject to such control to participate in the regulation provided their activities are adequately super-

---

8. Plaintiff's allegations of monopolization and boycott are expressed in terms of the market for CATV (Second Amended Complaint, p. 17). However, the plaintiff obfuscates its market concept by also adding that defendant's purpose was "to foreclose the plaintiff from entering . . . television market in Rockford, Illinois" (Second Amended Complaint, p. 6).

9. See Ordinance of May 2, 1966, Section 15.

vised by independent state officials. Rice v. Chicago Board of Trade, 331 U. S. 247, 67 S.Ct. 1160, 91 L.Ed. 1468 (1947); United States v. South Eastern Underwriters Association, 322 U.S. 533, 64 S.Ct. 1162, 88 L.Ed. 1440 (1944); Schwegmann Brothers v. Calvert Distillers Corp. 341 U.S. 384, 71 S.Ct. 745, 95 L.Ed. 1035 (1951).

What was done in the instant action by the City Council is purportedly the exercise of a valid governmental function. The antitrust laws are aimed at private action, not at governmental action. Accordingly, the decision made by the City Council, an agency of the state, pursuant to state law, enfranchising one competitor and not the other is the exercise of a governmental function which is not reached by the antitrust laws.

## III. PLAINTIFF'S ALLEGATIONS OF CROSS-OWNERSHIP AND CONTROL FAIL TO ADEQUATELY STATE A CLAIM IN VIOLATION OF FEDERAL ANTITRUST LAW.

■ The plaintiff alleges in its complaint that Hickerson, an officer of both CATV of Rockford and WCEE-TV "was able to use the resources and facilities of both to foreclose Metro Cable from obtaining a franchise." [10] Not every agreement or combination is *per se* in restraint of trade. For example, it is well settled that it is not a *per se* violation of the antitrust laws for a manufacturer or supplier to agree with a distributor to give him an exclusive franchise even if this means cutting off another distributor. See United States v. Arnold Schwinn & Co., 388 U.S. 365, 87 S. Ct. 1856, 18 L.Ed.2d 1249 (1967); Lawlor v. National Screen Service Corp., 352 U.S. 992, 77 S.Ct. 526, 1 L.Ed.2d 540 (1957); United States v. Columbia Steel Co., 334 U.S. 495, 68 S.Ct. 1107, 92 L. Ed. 1533 (1948). Common ownership and control does not *ipso facto* impute a violation of the federal antitrust laws. Kiefer Stewart Co. v. Joseph E. Sea-

grams & Sons, Inc., *supra*; Timken Roller Bearing Co. v. United States, 341 U.S. 593, 71 S.Ct. 971, 95 L.Ed. 1199 (1951); United States v. Yellow Cab Co., 332 U.S. 218, 67 S.Ct. 1560, 91 L. Ed. 2010 (1947). The issue in these cases is not the existence or nonexistence of common ownership or control, but rather whether the purpose and effect of the ownership, association, exchange or combination was unreasonable to exclude outsiders from participating in the trade question.

■ As was discussed above the plaintiff Metro was foreclosed from participating in the relevant trade by its failure to obtain a franchise from the City Council, an action which is exempted from the coverage of the federal antitrust laws. The plaintiff in this allegation fails to adequately state a cause of action because without the plaintiff having first obtained a franchise, the defendant's common ownership or control does not and cannot pose an unlawful threat to the plaintiff's legitimate trade.

Since the plaintiff has failed in this allegation to adequately state a claim upon which relief can be granted, this Court need not pass on the question of exclusive jurisdiction of the Federal Communications Commission over this allegation.

However, this Court will note in passing that the defendants' contentions are not completely without merit. See Pan American Airways, Inc. v. United States, 371 U.S. 296, 83 S.Ct. 476, 9 L. Ed.2d 325 (1967); 47 U.S.C. § 314; 47 C.F.R. part 76; 38 F.C.C.2d 10, 16 (1972). Cf. United States v. Radio Corporation of America, 358 U.S. 334, 79 S.Ct. 457, 3 L.Ed.2d 354 (1959).

It is clear that the plaintiff in the instant amended complaint has failed to adequately state a claim upon which relief can be granted.

Accordingly, it is hereby ordered that defendants' motion to dismiss is granted and the cause is dismissed without prejudice.

10. Second Amended Complaint, p. 15.