CITY OF FAIRFAX et al., Appellants,

v.

FAIRFAX HOSPITAL ASSOCIATION et al., Appellees.

No. 76–1775.

United States Court of Appeals, Fourth Circuit.

Argued Jan. 12, 1977.

Decided Aug. 22, 1977.

Henry St. John Fitzgerald, Arlington, Va. (Tolbert, Smith, Fitzgerald & Ramsey, Arlington, Va.), Nolan E. Clark, Washington, D. C. (Kirkland, Ellis & Rowe, Washington, D. C.), and John Rust, Jr., City Atty., Oakton, Va., for appellants.

Paula Jameson, Asst. County Atty., Fairfax, Va., for appellee Industrial Development Authority of Fairfax County, Va.

Ray S. Bolze, Kenneth E. Krosin, and Mark W. Pennak, Washington, D. C. (Howrey & Simon, Washington, D. C.), William C. Bauknight, Fairfax, Va. (McCandlish, Lillard, Bauknight, Church & Best, Fairfax, Va.), for appellees Fairfax Hospital Assn., Commonwealth Doctors Hospital, Inc.

Before WIDENER, Circuit Judge, HALL, Circuit Judge, and WYZANSKI, Senior District Judge.*

WYZANSKI, Senior District Judge:

Eight plaintiffs—the City of Fairfax, Virginia, six physicians, and one oral surgeon—appeal from a summary judgment for three defendants—Fairfax Hospital Association (FHA), a private, nonprofit corporation operating Fairfax Hospital, Commonwealth Doctors Hospital, Inc. (CDH), a private corporation operated for profit, and the Industrial Development Authority of the County of Fairfax, Virginia (IDA).

The complaint alleged violations by defendants of Sections 1, 2, and 3 of the Sherman Act (15 U.S.C. §§ 1, 2, and 3), as well as a violation of Virginia state law said to be within the District Court's pendent jurisdiction. Plaintiffs prayed for an injunction pursuant to Section 16 of the Clayton Act (15 U.S.C. § 26), but not for damages.

The substance of the claim was that there were in Fairfax County, Virginia only two hospitals—one operated by FHA, the other

* Sitting by designation.

by CDH,—and that, by an impending lease of the facilities of CDH to be made by an agency of the Commonwealth of Virginia, IDA, the defendants would be engaging in federal restraints of trade, monopolization, and contracts in restraint of trade.

Defendants' answer raised three principal issues: whether there was such an effect on interstate commerce as to bring the complaint within the coverage of the Sherman Act; whether plaintiffs had standing to complain of defendants' alleged violations of that act; and whether defendants came within the "state action" exemption from the antitrust statutes.

Following pre-trial discovery, each of the parties moved for summary judgment on the three aforesaid issues. In their arguments all parties took the position that *only* the issues of standing and of state action were ripe for summary judgment. However, the District Judge in colloquies with counsel drew attention to the interstate commerce issue, on the ground that "the Court has the duty to raise it itself, because that goes to the issue of jurisdiction."

Then the District Judge found that interstate commerce was not sufficiently involved, and granted defendants' motion for summary judgment on that ground, as well as on the grounds that plaintiffs lacked standing and that defendants were immunized by the doctrine of state action.

The facts so far revealed by pre-trial discovery may be briefly summarized.

The Commonwealth of Virginia administers the affairs of Fairfax County through the Fairfax Board of Supervisors. That Board in 1947 established as a public body a Health Center Commission as authorized by the 1946 "Hospital and Health Center Commission Act", codified at Va.Code Ann. §§ 32–276, *et seq.*, as amended (1976 Cum. Supp.). In 1955 that Commission fostered the creation of Fairfax Hospital Association, a private non-profit corporation, which still exists, and is an organization of private individuals who pay $5 each to become members.

FHA has operated for two decades Fairfax Hospital, which now has 600 beds. The hospital facilities and the land on which they stand are leased to FHA by Fairfax County. The lease requires FHA to advise the county of its actions, submit before its adoption its budget to the county, and also to submit for comment important contracts before their execution; but, so far as now appears, the county has not a veto power, an amendment power, or any other coercive power of control. The lease provides that at its expiration the facilities become, and the land remains, the absolute property of the county.

The only acute care facility in Fairfax County other than FHA's is operated by CDH, another hospital, founded in 1967, with 160 beds of which 131 are in use.

Both FHA and CDH buy from outside Virginia over 75% of their drugs and other supplies, amounting to approximately $10,-000,000 annually. Both hospitals derive approximately 60% of their gross revenues, or about $24,000,000 from Group Hospitalization, Inc. in the District of Columbia, Medicare, and Medicaid, and an additional $7,500,000 from insurance carriers outside Virginia.

In September 1974 FHA entered into an agreement of intent to purchase all of the CDH assets. Before the agreement no federal, state, or county governmental agency was formally notified, or asked to take any action; and none did act.

After the agreement of intent the parties approached the Fairfax County Board of Supervisors to assist in the take-over. The Board's personnel recommended the use of an industrial development authority (IDA) to be created by the Board pursuant to the Virginia Industrial Development and Revenue Bond Act, codified at Va.Code Ann. §§ 15.1—1373–1399, as amended (1976 Cum. Supp.). They contemplated that such an IDA could purchase CDH and lease it to FHA, and that IDA could raise funds by issuing tax-exempt bonds, thus saving, over the term of the bonds, about $6,000,000 of the sums which otherwise would be required to meet the costs of conventional financing if FHA were to have been the

purchaser of CDH and to have raised the funds by going directly to the financial markets.

Pursuant to that recommendation, the Board created an IDA, and, by an ordinance on October 28, 1974, authorized and directed it to buy the facilities of CDH and lease them to FHA. On September 8, 1975 the Board approved the lease by IDA of the CDH facilities to FHA.

This led plaintiffs to file this civil antitrust action. In each of the only three counts of the complaint which are relevant to the present appeal the pleading is directed to the leasing of CDH by IDA to FHA. It is alleged that that leasing, according to count I, will eliminate competition between CDH and FHA, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, according to count II, will monopolize interstate commerce, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2, and, according to count III, will constitute a contract in restraint of trade, in violation of Section 3 of the Sherman Act, 15 U.S.C. § 3.

In the District Court plaintiffs sought, but were denied, a preliminary injunction prohibiting IDA from acquiring and leasing to FHA CDH's assets, and barring IDA from issuing bonds to raise the funds to pay for the acquisition.

There followed pre-trial discovery and, thereafter, the already-described motions for summary judgment and judgment for defendants. Plaintiffs appealed to this Court.

Our sole appellate function is to decide whether the District Court properly entered a summary judgment upon the abbreviated record consequent upon the discovery. We shall not intimate what would be an appropriate judgment following a full trial.

■ With respect to the issue whether interstate commerce was sufficiently involved to give the District Court jurisdiction under the antitrust acts, the District Judge was probably misled by our decision in *Hospital Bldg. Co. v. Trustees of Rex Hospital*, 511 F.2d 678 (CA 4, 1975), which has subsequently been reversed, *Hospital*

*Bldg. Co. v. Trustees of Rex Hospital*, 425 U.S. 738, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976). The Supreme Court's ruling in that case makes it evident that it was an error for the District Judge summarily .to adjudge on the basis of the evidence then before it that there was not a sufficiently substantial effect on interstate commerce to give the court jurisdiction under the Sherman Act. Without anticipating what may be shown at a plenary trial, we merely note that the present record shows that sources outside Virginia furnished both of the hospitals here involved with such substantial supplies and revenues as to indicate that the cited Supreme Court case seems to govern.

■ Nor can we sustain the District Court's summary judgment on the alternative ground that the record shows that at a plenary trial plaintiffs will not be able to prove that they have a standing to complain of defendants' alleged violation of the antitrust laws.

Section 16 of the Clayton Act, as amended, 15 U.S.C. § 26, provides that "any person" is entitled to an injunction on general equitable principles "against threatened loss or damage by a violation of the antitrust laws."

We do not need at this stage to consider what facts will finally be proved as to the effect that the lease by IDA of CDH facilities to FHA will have upon physicians practicing in Fairfax County, and upon the City of Fairfax which purports to speak for its inhabitants and which may pay directly or by reimbursement hospital bills. It is enough for us to say that we do not find that plaintiffs' claims as to the adverse effects upon their direct pecuniary interests are so remote, speculative, and conjectural as to permit them to be disposed of by summary judgment. There must be opportunity to present full evidence as to whether there are adverse economic effects upon patients, doctors, and the city when, instead of having a choice between two local hospitals, the sick and their physicians are remitted to a Hobson's choice. We leave the matter for further exploration at a plenary trial.

Next we consider defendants' contention that they are immunized by the "state action" exemption to the antitrust laws.

■ *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943) was the first Supreme Court case to hold that Congress did not intend the Sherman Act to apply to "state action". But, as subsequent cases, such as *Goldfarb v. Virginia State Bar*, 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975), and *Cantor v. Detroit Edison Co.*, 428 U.S. 579, 96 S.Ct. 3110, 49 L.Ed.2d 1141 (1976), have taught us, the exemption judicially created by *Parker v. Brown* has a very limited application. The Supreme Court's most recent case, *Cantor v. Detroit Edison Co.*, 428 U.S. 579, 96 S.Ct. 3110, 49 L.Ed.2d 1141 (1976), decided that a regulated utility could be found liable under the antitrust laws for tying the sale of its electricity and its light bulbs pursuant to the provisions of a tariff approved by state officials. Five of the Justices held that private conduct was not exempted unless, *at least*, it was shown either that the state *coercively* commanded the private conduct, or that the state in the strictest sense of the term *"regulated"* the private conduct.— (This is not, of course, to say that such a showing is always by itself enough to qualify for the exemption. See Note on the decisions of *The Supreme Court, 1975 Term*, 50 Harv.L.Rev., p. 58 *et seq.*, particularly subsection IIIA p. 229 *et seq.*, covering Antitrust Law, and more specifically pp. 231–232. As that note points out, some of the Justices indicated that *Parker v. Brown* requires much more to bring the exemption into play. *Ibid*, pp. 232–233.)

■ We do not find it advantageous at this stage of this case to set forth this intermediate appellate court's view of the present scope of the "state action" exemption. It will suffice to say that the facts so far developed at bar (which have been summarized in our statement of the case) do not prove that the Commonwealth of Virginia *compelled* FHA to do anything, or that it in the strictest sense *regulated* the hospital. Without pausing, at this preliminary stage of the litigation, to set forth *in extenso*, the documentary and other evidence so far submitted, we first note that we are not now persuaded that with respect to FHA the roles of the State and its agencies went beyond those of a landlord, of an indirect financier, and of a public authority to which information as to budgets, proposed contracts, and other data had to be submitted. If it turns out that there is nothing else in the form of "state action", the Commonwealth of Virginia has not commanded FHA to lease CDH from IDA, nor has the Commonwealth regulated FHA in such a way as to make applicable *Parker v. Brown* as interpreted by *Cantor v. Detroit Edison Co.*

But even if FHA does not enjoy a "state action" exemption from the antitrust laws, IDA contends that at least it, as a state agency, enjoys such an exemption. Much stress is laid on this contention, in the light of the complaint which, in each of the three counts under review, directs its fire at the act of IDA in leasing the CDH assets to FHA.

IDA particularly relies upon the Fairfax County Board of Supervisors' action in enacting, on October 28, 1974, an ordinance creating IDA for the specific purposes of raising funds to acquire the CDH assets, and leasing CDH to FHA for operation for the county. The ordinance stated, *inter alia*, that:

"The Authority [IDA] is hereby authorized and directed to lease Commonwealth Doctors Hospital [CDH] to the Fairfax Hospital Association [FHA] on such terms and conditions as are mutually acceptable to the Authority, the Board of Supervisors and the Association."

■ While, no doubt, IDA received a command, that command did not come from the legislature of Virginia. As we understand the prevailing opinion in *Cantor v. Detroit Edison Co.*, a command from any lesser state body does not automatically satisfy the conditions precedent for invocation of the "state action" doctrine. The *mere* fact that a body is "a state agency for some limited purposes" does not make it an "antitrust shield that allows it to foster

anticompetitive practices." *Goldfarb v. Virginia State Bar*, 421 U.S. 773, 791, 95 S.Ct. 2004, 2015, 44 L.Ed.2d 572 (1975).

■ Far more important is the dominant fact that in the case at bar the evidence now before us does not warrant us in treating the particular October 28, 1974 ordinance of the Fairfax County Board of Supervisors as analogous to a legislative coercive command nor to a legislative regulation of private conduct. In context, the ordinance is merely a firm direction from the Board to its creature, IDA.

Such a direction within the executive branch of a state government does not create a basis for concluding that the state as such has compelled action which would otherwise be a violation of federal law. A Congressional Act may be interpreted to avoid conflicts with state legislatures but it would be anomalous to interpret a Congressional Act to avoid conflicts with county commissioners.

■ Finally, defendants, in support of the judgment below, present an issue not covered in its opinion by the District Court: whether, aside from state action immunity, the lease of CDH by IDA is such an exclusive agreement involving publicly owned or imbued property as not to fall within the federal antitrust laws.

We see nothing in this contention but a re-formulation of one aspect of the claimed exemption under the doctrine of "state action". The facts so far developed preclude the contention for the very same reasons that they preclude other aspects of the doctrine. Up to now it has not been proven that the Commonwealth of Virginia coerced or, in the usual meaning of the term, regulated the conduct of FHA. The facts of the case as they now stand hardly differ from a case where a state buys from one private corporation property and leases it to another corporation which thereby monopolizes the market by controlling 100% of it.

Out of abundance of caution, we conclude by emphasizing that until there is a full record we do not express or imply any view on the ultimate merits of this case. It may be that when all the facts have been laid before the court it will appear that the Commonwealth of Virginia through Fairfax County is actually exercising complete control over the Fairfax County Hospital, and that every significant aspect of that hospital is operated as a state agency,—the Fairfax Hospital Association being nothing more than a citizens' advisory committee—which is required to follow, and is following, specific orders, and is turning over to the state any profits, if there are such. Under such circumstances it might be that the federal antitrust laws no more apply to the hospital than to any department of the government of the Commonwealth of Virginia. Nor do we know of any federal antitrust law that precludes a state from purchasing facilities in order to establish, state-wide or county-wide, a wholly public system of hospital care, even if that results in a monopoly. Such a situation would differ *toto coelo* from the use of state credit or leases to enable a wholly private hospital to acquire a monopoly. Until there has been a plenary trial we cannot know which, if either, of these hypotheses has application to this case.

*Judgment for defendants reversed, with costs; further proceedings to be in accordance with this opinion.*

WIDENER, Circuit Judge, concurring in the result:

The district court entered summary judgment in favor of the defendants on three independent grounds—lack of a sufficient nexus with interstate commerce to confer jurisdiction under the antitrust laws, absence of standing of the plaintiffs to prosecute this action, and the existence of state action immunity from antitrust scrutiny. I join in Judge Wyzanski's opinion reversing the court below on its first two grounds of judgment.

With respect to the question of state action immunity, I join in remanding the case to the district court for further consideration in light of *Cantor v. Detroit Edison Co.*, 428 U.S. 579, 96 S.Ct. 3110, 49 L.Ed.2d 1141 (1976), decided subsequent to the granting

of summary judgment below. Although, unlike Judge Wyzanski, I am not convinced that local governmental units cannot enjoy antitrust immunity, or that the compulsion of their laws cannot in appropriate instances confer it upon private defendants, I do agree that the proper application of *Cantor* calls for the development of a fuller factual record in the district court. I emphasize that upon remand a factual development must be had which relates not only to the question of the extent of involvement of the Commonwealth, through her laws or agencies, but also to the question of the involvement of local government, whether it be the county as such, or any of its agencies or controlled or authorized authorities.

### I.

The significance of the opinion of the Court in *Cantor* lies in its limitation of the opinion in *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943), as controlling only in cases in which anticompetitive conduct is engaged in by public officials acting pursuant to State law, or by the State itself. "The only Sherman Act issue decided [in *Parker*] was whether the sovereign State itself, which had been held to be a person within the meaning of § 7 of the statute, was also subject to its prohibitions. Since the case now before us does not call into question the legality of any act of the State of Michigan or any of its officials or agents, it is not controlled by the *Parker* decision." 428 U.S. at 591–92, 96 S.Ct. at 3117.

If the immunity bestowed by *Parker* applied only to the State itself and to those State officials who adopted and enforced California's agricultural proration program, unresolved was the status with respect to the antitrust laws of those private individuals who were subject to the challenged regulations. The plurality opinion in *Cantor* thus faced the other side of the *Parker* coin, the extent to which private persons who engage in anticompetitive practices that are permitted or even required by State law are subject to Sherman Act proscriptions.

The clear import of the Court's holding (and this is a majority) is that State approval of private conduct, even to the extent of formally requiring its continuation in certain circumstances, is insufficient by itself to confer immunity from antitrust liability. 428 U.S. at 592–98, 96 S.Ct. 3110, 3123. In *Parker's* words, "a state does not give immunity to those who violate the Sherman Act by authorizing them to violate it, or by declaring that their action is lawful." 317 U.S. at 351, 63 S.Ct. at 314. Read in light of *Cantor*, it thus appears that the "threshold inquiry" delineated in *Goldfarb v. Virginia State Bar*, 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975), "whether the activity is required by the State acting as a Sovereign," 421 U.S. at 790, 95 S.Ct. at 2015, expresses no more than a necessary, though not necessarily sufficient, condition to a finding of immunity in the sphere of private conduct. The threshold defined in *Goldfarb* was not crossed in that case, thus ending the immunity analysis ("We need not inquire further into the State-action question because it cannot fairly be said that the State of Virginia through its Supreme Court Rules required the anticompetitive activities of either respondent." 421 U.S. 790, 95 S.Ct. 2015); it was crossed in *Cantor*, where tariffs carrying the force of State law required the continuation of the challenged light bulb exchange program until further action of the State. Further inquiries were therefore necessary.

First, it was recognized that considerations of fairness could prevent the imposition of Sherman Act liability upon a person who was merely complying with State law. A the same time, however, the notion that antitrust liability must inevitably be deemed unjust in this context was specifically disclaimed. If the existence of the State compulsion resulted from a process of joint decisionmaking between the State and the defendant, i. e. if the defendant initiated the anticompetitive conduct and later obtained State approval, or if he otherwise engaged in the violation as much out of his own choice as State compulsion, there would be no unfairness in not immunizing

him, even from treble damage liability. Indeed, this was found to be the case in *Cantor*, where the light bulb program, as characterized in a later Supreme Court pronouncement, "was instigated by the utility with only the acquiescence of the State regulatory commission." *Bates. v. State Bar of Arizona,* —— U.S. ——, 97 S.Ct. 2691, 2698, 53 L.Ed.2d 810 (1977).

The resolution of this unfairness analysis necessitates a factual inquiry in each case. As is apparent here, however, sufficient findings have yet to be made. Quite significant are whether the defendants are indeed acting under legal compulsion (other than IDA, which appears from the record) and, if so, whether the compulsion is any other than of the defendants' own design, with the role of the State or County being essentially quiescent. *Cantor* rejects immunity on the ground of unfairness where legal obligations inconsistent with the Sherman Act arose to a sufficient extent from a process of shared decisionmaking between State authorities and private defendants. Here, it seems that Fairfax Hospital Association and Commonwealth Doctor's Hospital could have had guiding roles in this sale-lease transaction. I am not at all satisfied at this stage that the unfairness analysis suggested in *Cantor* (and rejected on the facts of that case) is supported by the record in this case as it now stands.

Secondly, even apart from considerations of fairness, an implied exemption from the antitrust laws may be found to the extent necessary to preserve existing State regulatory schemes that are demonstrated to serve strong, clearly articulated regulatory interests. No such interest was found in *Cantor*, where the State's policy toward the distribution of light bulbs was inferred to be neutral, and where the fate of the challenged exchange program would leave "almost entirely unimpaired" Michigan's interest in regulating the distribution of electricity. To be contrasted is the State of Arizona's interest in regulating the practice of law, recently examined in *Bates v. State Bar of Arizona,* supra. "[T]he regulation of the activities of the bar is at the core of the State's power to protect the public." —— U.S. at ——, 97 S.Ct. at 2697–2698.

Examining the state of the record in the present case, it is again apparent that further factual findings by the district court are necessary to a determination of the implied exemption question. Along with Judge Hall and Mr. Justice Blackmun, I do not question the considerable interest a State may have in regulating matters of health and safety, an interest that may well encompass a desire to achieve hospital ownership, or control, or both. But for the purpose of implying an exemption from the federal antitrust laws, of central importance is not whether the area of regulation is one in which the State could assert a strong regulatory interest, but whether it has in fact done so, and more specifically, whether the allegedly anticompetitive activity is part of an existing program of regulation that could be disrupted by the superimposition of antitrust standards. The evil sought to be avoided is the unnecessary disruption of existing State regulatory schemes. See *Cantor,* supra, 428 U.S. at 595–98, 96 S.Ct. 3110. Thus, in *Bates,* supra, the attorney advertising case, the Court made reference not only to the significant interest of the State in regulating the legal profession, but that, "[m]ore specifically, controls over solicitation and advertising by attorneys have long been subject to the State's oversight." —— U.S. at ——, 97 S.Ct. at 2698.

There is not sufficient indication in the record as presently constituted here, however, that the contemplated sale-lease transaction involved here is necessarily related to any existing regulatory interest in hospital ownership on the part of the State of Virginia or Fairfax County. Evidence to the contrary may appear if it is the fact that the transaction originated in an agreement between two private corporations, FHA and CDH. It is not enough to avail these private defendants of an absolute defense that the County's mere participation in their activity was within the scope of the powers conferred upon it by the State legislature. Nor is it sufficient that the County has asserted a general regulatory interest

in hospital facilities valid under State law. An essential inquiry the district court must make it whether this particular challenged transaction is part of an existing, public regulatory program that stands to be frustrated by the application of the antitrust laws. Only then may such an exemption be implied, to the minimum extent necessary to make the regulation work. *Cantor*, supra, 428 U.S. at 597, 96 S.Ct. 3110.

## II.

Of considerable importance to the ultimate resolution of the immunity issue in this case is the question of whether local governmental units may be shielded by *Parker*-type immunity for state action, and whether the same analyses articulated in *Cantor* apply with equal force to those private defendants who act in accordance with local laws regulating economic activity. Lacking the benefit of the district court's consideration of this issue in light of the most recent Supreme Court decisions on state action immunity, as well as of a complete factual record in this case, I would set out only in the most general terms a guideline for the district court to use in its reconsideration in this case.

I think the case of *City of Lafayette La. v. La. Power & Light Co.*, 532 F.2d 431 (5th Cir. 1976), cert. granted, 430 U.S. 944, 97 S.Ct. 1577, 51 L.Ed.2d 791 (1977), states approximately the correct rule. That case holds that the mere fact that the actions of a city are involved does not automatically place such actions outside the scope of the federal anti-trust laws, but adds that if the challenged activity were within the authority given a governmental entity to operate in a particular area, then the activity should be exempt. I would add to the rule of *City of Lafayette* that in addition to the prerequisites stated in that case the activity involved must meet one of the analyses set forth in *Cantor*.

I thus do not agree with Judge Wyzanski's apparent conclusion that a local governmental body must as a matter of fact be acting at the compulsion of the State, almost its alter-ego, in order to qualify for a *Parker* exemption. Rather, I think the activities of a governmental entity, State or local, may qualify for a *Parker* exemption if they meet one of the analyses of *Cantor*. My principal disagreement with Judge Hall is that I do not think the record in this case presently supports a finding that the parties were acting pursuant to legislative command.

I further agree with Judge Hall and feel that the fact that the actions taken by the defendants in this case involve the health of the community should be given special weight in determining whether, under any of the analyses of *Cantor*, an exemption from the federal antitrust laws should apply.

K. K. HALL, Circuit Judge, concurring and dissenting:

I concur with the majority holding that upon the record in this case there is sufficient interstate commerce involved to confer jurisdiction upon the district court to permit the case to proceed to trial. *Hospital Building Co. v. Rex Hospital Trustees*, 425 U.S. 738, 743–745, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976), decided after the district court rendered its opinion compels this result.

I also concur with the majority holding that upon the record in this case the plaintiffs, the City, and the individual physicians have alleged sufficient pecuniary injuries to confer standing to sue and proceed to trial.

I respectfully dissent, however, as to the ruling regarding the state action exemption to the antitrust laws and would affirm the district court ruling granting summary judgment in the defendants on that basis.

First. The district court and the parties agreed that the record in this case at the time the motions for summary judgment were considered as adequate for a decision as to whether or not the IDA–FHA–CDH acquisition was exempt under the "state action" exemption to the antitrust laws set forth in *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943). I agree with the district court that the record is sufficient to decide that issue at this time and, therefore, I see no need to postpone a ruling

meeting this issue pending a trial on the merits.

Second. I also dissent from that portion of the majority opinion regarding the "state action" exemption that does base its decision on the record as it is presently constituted, but nevertheless seeks to apply the standards set by the Supreme Court in the "state action" exemption cases in *Parker, supra, Goldfarb, supra,* and *Cantor, supra,* resulting in what is essentially advisory dicta regarding this court's view of the "state action" exemption. If a reversal is in order, since *Cantor v. Detroit Edison Co.,* 428 U.S. 579, 96 S.Ct. 3110, 49 L.Ed.2d 1141 (1976), and *Bates v. State Bar of Arizona,* —— U.S. ——, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977), were decided after the district court rendered its memorandum opinion and order, I would permit the district court to apply *Cantor* and *Bates* for itself in the first instance rather than have this court render what is essentially an advisory opinion.

Third. I disagree with the substance of the majority opinion which, to me, subject to possible correction,[1] interprets the scope of the "state action" exemption to the antitrust laws much too narrowly upon the facts in this case. I would affirm the district court's ruling granting the defendants' motion for summary judgment on state action exemption grounds for the reasons succinctly stated by the district court in its opinion below. *See City of Fairfax, Va. v. Fairfax Hospital Association,* [1976–2] *CCH TRADE CASES* ¶ 60,999, at pp. 69,424 to 69,425 (No. 75–866A, May 3, 1976).

Lest there be any misunderstanding of the rule I would adopt in this case, I would *not* broadly hold that the mere participation by a governmental entity less than the state *per se* confers a "state action" exemption to the antitrust laws. What I *would* hold is that, although there was indeed a "blend of private and public decision making" in the facts of this case, the conduct of all the parties acting pursuant to legislative

command as set forth in the district court opinion sufficiently deprived the private parties of their "freedom of choice to act" rendering it "unfair" not to exempt the defendants from the reach of antitrust laws. *Cantor, supra,* 96 S.Ct. at 3118, 3119. Other courts, in *pre Cantor* decisions, *contra* the majority have held somewhat similar type transactions exempt. *See Ladue Local Lines, Inc. v. Bi-State Development Agency of the Missouri-Illinois Metropolitan District,* 433 F.2d 131 (8th Cir. 1970) (passenger transportation facilities); *Metro Cable Co. v. CATV of Rockford, Inc.,* 375 F.Supp. 350 (N.D.Ill.1974), *aff'd,* 516 F.2d 220 (7th Cir. 1975) (municipality and exclusive cable T.V. franchise); *E. W. Wiggins Airways, Inc. v. Massachusetts Port Authority,* 362 F.2d 52 (1st Cir. 1966), *cert. denied,* 385 U.S. 947, 87 S.Ct. 320, 17 L.Ed.2d 226 (1966) (Port Authority created pursuant to legislative mandate to operate Boston's Logan International Airport). *See also Murdock v. City of Jacksonville, Florida,* 361 F.Supp. 1083 (M.D.Fla.1973) (exclusive lease to private party by City of coliseum for wrestling matches—if not "state action," then leasing was "official action directed by a state" under *Parker v. Brown* ).

Finally, it should be noted that this case does not deal with regulation of agricultural competition in the private sector of the economy, as in *Parker v. Brown, supra.* Nor does this case concern antitrust regulation or exemption of the professions or their first amendment rights as in *Goldfarb v. Virginia State Bar,* 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975), and *Bates v. State Bar of Arizona,* —— U.S. ——, 97 S.Ct. 2691, 53 L.Ed.2d 810 (1977). Nor does it involve an antitrust exemption assertedly arising out of private unregulated conduct which was a corollary to pervasively state-regulated conduct as occurred in the light-bulb exchange program assailed in *Cantor v. Detroit Edison Co., supra.*

Instead, I believe this case presents the issue left open by Justice Blackmun concur-

---

1. At least one case presently pending before the Supreme Court could markedly alter this dissent. In *City of Lafayette, La. v. Louisiana Power & Light Co.,* 532 F.2d 431 (5th Cir. 1976), *cert. granted,* 430 U.S. 944, 97 S.Ct.

1577, 51 L.Ed.2d 791 (1977), the "state action" exemption to the antitrust laws as related to conduct of municipalities appears to be squarely before the court.

ring in *Cantor v. Detroit Edison Co., supra,* 96 S.Ct. at 3126 and 3128, and clarified by him in *Bates v. State Bar of Arizona, supra,* —— U.S. ——, 97 S.Ct. 2691, 53 L.Ed.2d 810. In *Cantor,* Justice Blackmun noted that considerations of "health or safety" would at least weigh "forcefully" in his application of a "rule of reason" analysis in state action cases. In *Bates,* speaking for the entire Court, Justice Blackmun placed *Cantor* in context by noting that in that case "[t]here was no suggestion that the [light] bulb program was justified by flaws in the competitive market or was a response to health or safety concerns." —— U.S. ——, ——, 97 S.Ct. 2691, 2697, 53 L.Ed.2d 810. *See also City of Fairfax v. Fairfax Hospital Association,* [1976–2] *CCH TRADE CASES* ¶ 60,999 at p. 69,424 to 69,425; *Lowenstein v. Evans,* 69 F. 908 (Cir.Ct. S.C. 1895), at 911; *Note: The Supreme Court, 1975 Term,* 90 Harv.Law Rev. 56, 237 (1976).

I therefore believe the district court correctly entered summary judgment for the defendants in this case on the state action exemption grounds, would determine that issue on this record at this time, and would affirm.