**GREENVILLE PUBLISHING COMPANY, INC., Appellant,**

**v.**

**The DAILY REFLECTOR, INCORPORATED, et al., Appellees.**

**No. 73–2323.**

United States Court of Appeals, Fourth Circuit.

Argued March 6, 1974.

Decided May 1, 1974.

---

R. Kennedy Bridwell, Raleigh, N. C. (Richard E. Thigpen, Jr., C. Wells Hall, Thigpen & Hines, P. A., Charlotte, N. C., on brief), for appellant.

William C. Lassiter, Raleigh, N. C. (Lassiter & Walker, Raleigh, N. C., Louis W. Gaylord, Jr., Gaylord & Singleton, Greenville, N. C., on brief), for appellees.

Jonathan T. Howe, Robert A. Garrett, Jenner & Block, Chicago, Ill., on brief for amici curiae, National Assn. of Advertising Publishers and Publishers Distribution Institute.

Before CRAVEN and WIDENER, Circuit Judges, and WARD, District Judge.*

CRAVEN, Circuit Judge:

The parties in this antitrust suit are competitors in the business of local advertising in Greenville, North Carolina. Both plaintiff and defendants publish shoppers guides, free weekly tabloids composed almost entirely of advertising. Defendants also publish the only daily newspaper in Greenville. Plaintiff charged defendants with setting their shopper's advertising rates below cost in order to regain the monopoly they enjoyed before plaintiff entered the market. The district court entered summary judgment for defendants. On appeal the major issues are the sufficiency of the parties' connection with interstate commerce and the legality of defendants' pricing policies under the Sherman Act. We reverse and remand for trial.

Plaintiff, the Greenville Publishing Company, was organized in 1970 to publish a shoppers guide in Greenville. The organizers were apparently unaware that the publishers of the Greenville Daily Reflector had just finished modernizing and expanding their facilities with an eye toward publication of their own shoppers guide. Upon learning of the newcomer's plans, the Reflector's management decided to accelerate their schedule. Thus the first issue of the Reflector Shoppers Guide and the first issue of plaintiff's Advocate appeared on the same day.

Plaintiff distributes The Advocate to substantially all the households in Pitt County. The Reflector Shoppers Guide has had a smaller circulation. Because management regards it as an adjunct to the Daily Reflector, they have distributed it only to households that do not subscribe to the newspaper. They have also offered a combination advertising rate: advertisements that appear in the Daily Reflector can be rerun in the Shoppers Guide at half price. The Shoppers Guide advertising rates are otherwise equal to rates charged by the Daily Reflector.[1]

After operating the Reflector Shoppers Guide at a loss for the first year, defendants decided to reduce it from standard newspaper size to tabloid size. A reduction in costs and an increase in revenue followed, and as of February 1973 defendants claimed that their Shoppers Guide was turning a slight profit. The Advocate, whose larger revenue has been consistently absorbed by larger publishing costs, had sustained a $70,000 operating loss by the end of 1972. This lawsuit was the consequence.

The complaint alleges that defendants have deliberately set their advertising rates below cost and have made deceptive statements about their circulation figures[2] in an attempt to eliminate The Advocate from competition. It charges that defendants have entered into a combination and a conspiracy, and have solicited contracts, in restraint of trade under section 1 of the Sherman Act, 15 U.S.C. § 1, and that they are guilty of monopolization and an attempt to mo-

---

* Sitting by designation.

1. During most of the period in question, the rate per column-inch in the Daily Reflector was $1.60. Thus an advertiser could place a one-inch ad in either the Daily Reflector or the Shoppers Guide for $1.60, or he could run his ad in both for $2.40. The same rate structure applied to long-term advertising at contract discounts; the advertiser could contract for advertising in the Shoppers Guide for half the cost of the newspaper contract.

2. Plaintiff complains that the masthead of the Shoppers Guide shows the combined circulation of the Daily Reflector and the Shoppers Guide. Apparently there is no intentional misrepresentation as the masthead states that the total circulation of the Daily Reflector and the Shoppers Guide is 24,000; each publication has an independent circulation of about 12,000.

nopolize in violation of section 2 of the Sherman Act, 15 U.S.C. § 2.[3] The complaint alleges that these practices have caused plaintiff's inability to publish the Advocate at a profit, asking for treble damages and injunctive relief.

After the parties had spent about a year in discovery, defendants asked for summary judgment, both on the merits and on the ground that the connection with interstate commerce was too tenuous to sustain a cause of action under the Sherman Act. The district court granted the motion and filed a memorandum opinion. Although the district judge was satisfied that the interstate commerce requirement was lacking, he proceeded to the merits, "construing interstate commerce principles liberally." He concluded that there was no material factual issue on any of plaintiff's allegations and that defendants had established they were entitled to judgment as a matter of law.

### Interstate Commerce

■ The evidence on the interstate commerce issue is meager, perhaps because defendants did not raise the argument until just before the deadline for discovery.[4] Nonetheless, there is enough uncontroverted evidence to prohibit entry of summary judgment on this ground.

The complaint alleges that the Daily Reflector and both shoppers guides carry advertising for local affiliates of national sales organizations such as Ford Motor Company, A & P Food Stores, International Harvester, RCA, and others. Defendants' answer effectively admits these allegations. The deposition of Lauren Spence Riddick, the Daily Reflector's "National Advertising Manager," includes testimony that the newspaper carries an unspecified volume of national advertising furnished by an agency in Atlanta. Mrs. Riddick also testified that the Daily Reflector had notified the Atlanta agency that advertising space was available in the Shoppers Guide, though none had yet been sold. The deposition of Donald Eugene Evans, an advertising salesman for the Daily Reflector, describes the practice of "cooperative advertising." Mr. Evans

3. The parties differ sharply over the proper construction of the complaint. Plaintiff contends that it alleges both monopolization and an attempt to monopolize. Defendants insist that the phrase "attempted to maintain their dominant monopolistic position and destroy competition" alleges only an attempt. The district court treated plaintiff's inartful language as an allegation of an attempt to monopolize, apparently without considering whether it also alleged monopolization. Under Fed.R.Civ.P. 8(f), and in the spirit of avoiding the pitfalls of common law pleading, we cannot perceive any harm in allowing plaintiff to proceed on both theories. Defendants have alleged no prejudice, and the issues of market definition and monopoly power have been developed in discovery.

4. The amended complaint contained the following allegation of jurisdiction:
2. This Court has jurisdiction of this action because:
a. The matter in controversy arises under an act of Congress regulating commerce or protecting trade and commerce against restraints and monopolies (28 U. S.C.A. § 1337).; and
b. The matter in controversy arises under the Sherman Antitrust Act, Secs. 1 and 2 (15 U.S.C.A. §§ 1 and 2), and the Clayton Act, Secs. 4 and 16 (15 U.S.C.A. §§ 15 and 26).
The defendants' answer gave the following response to paragraph 2 of the complaint:
2. The defendants do not contest the jurisdiction of the Court.
Then, after making admissions and denials to specific allegations in the complaint, the answer stated:
AS A FURTHER ANSWER AND DEFENSE, THE DEFENDANTS ALLEGE:
1. The Amended Complaint fails to state a claim against the defendants, or any one or more of them, upon which relief can be granted.
On March 2, 1973, plaintiff served a set of interrogatories on defendants asking for particularization of the contention that plaintiff had failed to state a cause of action. Defendants declined to answer, asserting that they were not required to answer legal questions. Plaintiff's brief in this court states that defendants first raised the interstate commerce issue on April 30, 1973, in their brief in support of summary judgment. The deadline for discovery was May 2.

testified that national manufacturers sometimes reimburse their local affiliates for advertising campaigns. The record contains no information about the volume or frequency of cooperative advertising carried by the Daily Reflector and no indication whether the Shoppers Guide has sold advertising on a similar basis.

■ An antitrust plaintiff may establish the necessary connection with interstate commerce in either of two ways: by demonstrating that the alleged anticompetitive conduct occurred in interstate commerce, or by showing that the conduct, though wholly intrastate, had a substantial effect on interstate commerce. Burke v. Ford, 389 U.S. 320, 88 S.Ct. 443, 19 L.Ed.2d 554 (1967); Sun Valley Disposal Co. v. Silver State Disposal Co., 420 F.2d 341 (9th Cir. 1969). In Lorain Journal Co. v. United States, 342 U.S. 143, 72 S.Ct. 181, 96 L. Ed. 162 (1951), the Supreme Court applied the "in commerce" test to a small-town Ohio newspaper. After cataloging the many interstate contacts of both the newspaper and the competing radio station, the Supreme Court settled on a narrow ground of decision. It held:

> The distribution within Lorain of the news and advertisements transmitted to Lorain in interstate commerce for the sole purpose of immediate and profitable reproduction and distribution to the reading public is an inseparable part of the flow of the interstate commerce involved.

*Id.* at 152. The uncontroverted facts on this record demonstrate that the advertising market in Greenville may likewise be a part of interstate commerce for the purpose of the Sherman Act. The only factor that remains to be established is the relative volume of interstate advertising in the Daily Reflector's business or in the Greenville market. While a "substantial quantity" of national advertising is apparently enough to satisfy the "in commerce" test, *Lorain Journal, supra* at 146–147, isolated and infrequent sales of interstate advertising might not suffice to transform a small-town newspaper into an interstate business. *See* Rasmussen v. American Dairy Ass'n, 472 F.2d 517, 524 (9th Cir. 1972), cert. denied, 412 U.S. 950, 93 S.Ct. 3014, 37 L.Ed.2d 1003 (1973); United States v. Pennsylvania Refuse Removal Ass'n, 357 F.2d 806 (3d Cir.), cert. denied, 384 U.S. 961, 86 S.Ct. 1588, 16 L.Ed.2d 674 (1966); Page v. Work, 290 F.2d 323, 328, 332 (9th Cir.), cert. denied, 368 U. S. 875, 82 S.Ct. 121, 7 L.Ed.2d 76 (1961).[5] Without speculating on the amount of national advertising that would serve this purpose, we note that the issue must be resolved in the context of the Supreme Court's declaration that the Sherman Act exercises all of Congress's constitutional power over commerce. *E. g.,* United States v. South-Eastern Underwriters Ass'n, 322 U.S. 533, 553–559, 64 S.Ct. 1162, 88 L.Ed. 1440 (1944).[6]

■ Defendants argue, however, that *Lorain Journal* does not apply to

---

5. In United States v. International Boxing Club, 348 U.S. 236, 75 S.Ct. 259, 99 L.Ed. 290 (1955), the Supreme Court held that an enterprise was in interstate commerce by virtue of receiving 25% of its revenue from interstate operations. In Times-Picayune Publishing Co. v. United States, 345 U.S. 594, 602 n. 11, 73 S.Ct. 872, 97 L.Ed. 1277 (1953), the Court followed *Lorain Journal* without mentioning the amount of interstate advertising involved. Of course, it may have been willing to assume that the major daily newspapers in New Orleans carried a "substantial" volume of national advertising.

6. The issue we outline is not the same as the inquiry required by the "effects" test of interstate commerce under the Sherman Act. If the newspaper is found to be operating *in* interstate commerce by virtue of carrying an adequate volume of interstate advertising, the Sherman Act will apply without a showing of the quantitative *effect* on the interstate market. *See* United States v. Shubert, 348 U.S. 222, 226–227 & n. 8, 75 S.Ct. 277, 99 L.Ed. 279 (1955); Las Vegas Merchant Plumbers Ass'n v. United States, 210 F.2d 732, 739–740 n. 3 (9th Cir.), cert. denied, 348 U.S. 817, 75 S.Ct. 29, 99 L.Ed. 645 (1954); *cf.* Rasmussen v. American Dairy Ass'n, 472 F.2d 517, 526–528 (9th Cir. 1972).

this case because there is no evidence that The Advocate has published any interstate advertising. Fastening on the Supreme Court's description in *Lorain Journal* of the radio station's interstate business and its statement that the newspaper intended to destroy WEOL altogether, defendants urge us to hold that the only relevant inquiry is the *victim's* involvement in interstate commerce. We think it clear that the Supreme Court has not endorsed this theory. The district court opinion in *Lorain Journal* is consistent with defendants' narrow view of the Sherman Act.[7] The district court focused exclusively on the radio station, holding that radio broadcasting in general was interstate commerce and therefore entitled to the protection of the Sherman Act. The Supreme Court affirmed on a different theory, adding extensive factual discussion of the newspaper's interstate activities, holding that local dissemination of interstate advertising was part of interstate commerce, and characterizing the newspaper's scheme as "an attempt to monopolize interstate commerce," 342 U.S. at 149, as well as an attempt to destroy the radio station. The Supreme Court's approach strongly implies that the Sherman Act protects the market as well as the victim. *See also* Perma Life Mufflers, Inc. v. International Parts Corp., 392 U.S. 134, 88 S.Ct. 1981, 20 L. Ed.2d 982 (1968); Simpson v. Union Oil Co., 377 U.S. 13, 84 S.Ct. 1051, 12 L.Ed. 2d 98 (1964). Defendants' theory would undermine that protection. It would allow an interstate trader to destroy local competitors as long as it acted before

they captured any of the interstate trade. To avoid such a result, we hold that the Sherman Act applies to the alleged monopolization of an interstate market even though the immediate victim may not be engaged in interstate commerce. *Cf.* Moore v. Mead's Fine Bread Co., 348 U.S. 115, 75 S.Ct. 148, 99 L.Ed. 145 (1954).[8]

### Monopolization and Attempt to Monopolize

■ Plaintiff's basic contention is that defendants sold advertisements in the Shoppers Guide below cost to drive the Advocate out of Greenville. This line of reasoning adequately describes a violation of section 2 of the Sherman Act. Deliberate below-cost pricing is generally considered a severely anticompetitive practice. Ovitron Corp. v. General Motors Corp., 295 F.Supp. 373, 378 (S.D.N.Y.1969) (denying summary judgment motion), 364 F.Supp. 944 (1973) (dismissed on merits for failure to prove injury); Mt. Lebanon Motors, Inc. v. Chrysler Corp., 283 F.Supp. 453, 459–460 (W.D.Pa.1968), aff'd, 417 F.2d 622 (3d Cir. 1969); Bergjans Farm Dairy Co. v. Sanitary Milk Producers, 241 F.Supp. 476, 485 (E.D.Mo.1965), aff'd, 368 F.2d 679 (8th Cir. 1966). Although it may not be illegal in itself, it can furnish evidence of either the specific intent required to prove an illegal attempt to monopolize or the general intent which, accompanied by monopoly power, constitutes the offense of monopolization. Schine Chain Theatres, Inc. v. United States, 334 U.S. 100, 120–121, 68 S.Ct. 947, 92 L.Ed. 1245 (1948); Story

---

7. United States v. Lorain Journal Co., 92 F. Supp. 794 (N.D.Ohio 1950).

8. Defendants have also argued that the Sherman Act does not apply in this case because the newspaper's interstate contacts are only incidental to the alleged anticompetitive conduct. This may be true of plaintiff's allegations that the newspaper purchases paper and ink from out of state and prints substantial quantities of national and international news, but the alleged monopolization is directed specifically at the Greenville advertising market. If plaintiff proves that

this market is "in commerce" and that defendants' acts constituted monopolization or a restraint of trade, prohibition of defendants' conduct would be justifiable as a means of protecting interstate commerce in advertising. *See* Rasmussen v. American Dairy Ass'n, 472 F.2d 517, 526–527 (9th Cir. 1972). This case is therefore unlike Savon Gas Stations No. Six, Inc. v. Shell Oil Co., 309 F.2d 306 (4th Cir. 1962), and Lawson v. Woodmere, Inc., 217 F.2d 148 (4th Cir. 1954), in which the alleged restraints were unrelated to the interstate aspects of the businesses involved.

Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 51 S.Ct. 248, 75 L.Ed. 544 (1931).

■ Defendants have suggested that Greenville is a natural newspaper monopoly and that we should apply a more lenient standard under the Sherman Act. The record contains no evidence that the Greenville market cannot accommodate the Daily Reflector and both shoppers guides, but even if we proceeded on the assumption that one of the shoppers guides must fail, deliberate exclusionary conduct would still support a charge of attempted monopoly. The characteristics of a natural monopoly make it inappropriate to apply the usual rule that success in driving competitors from the market is evidence of illegal monopolization. *See* United States v. Griffith, 334 U.S. 100, 105–107, 68 S.Ct. 941, 92 L.Ed. 1236 (1948). This variance allows businesses to compete fairly for a natural monopoly market, with assurance that the winner will not be penalized. John Wright & Associates, Inc. v. Ullrich, 328 F.2d 474 (8th Cir. 1964); American Football League v. National Football League, 323 F.2d 124, 131 (4th Cir. 1963). But the antitrust laws need not tolerate exclusionary conduct whenever it appears that only one competitor can survive the preliminary bout. A charge of attempted monopolization may still rest on proof that one of the competitors has engaged in exclusionary practices with the intent of hastening the other's demise. Union Leader Corp. v. Newspapers of New England, Inc., 284 F.2d 582 (1st Cir. 1960), cert. denied, 365 U.S. 833, 81 S.Ct. 747, 6 L.Ed.2d 201 (1961).

Although the district judge recognized that questions of intent in antitrust cases are ordinarily inappropriate for resolution on summary judgment, he nonetheless concluded that "publication of The Reflector Shoppers Guide was based on competitive business considerations and that any loss sustained was due to the beginning of a new enterprise." Memorandum Opinion at 9. This conclusion is based on a listing of "uncontroverted facts" that includes the following:

. . . (3) That the advertising rates for The Reflector Shoppers Guide were determined by the Defendants without knowledge of The Advocate's rates and were set at approximately one-half the per-inch rate of The Daily Reflector as a sound pricing practice in accordance with other newspaper publishers who had initiated shoppers of their own. . . .
(5) That the Defendants expected their shopper to be profitable, and once it was decided to switch to tabloid form a profit was seen . . . ..

*Id.* at 8–9. These factual conclusions overlook the major point of contention between plaintiff and defendants. Defendants' affidavits assert that the Shoppers Guide became a profitable venture in 1972, demonstrating a total profit of $323.86 for the 55-week period ending February 28, 1973.[9] Plaintiff contends that defendants' method of cost accounting does not give an accurate picture of the expense of producing the Shoppers Guide, and that defendants' profit figures would be wiped out if the balance sheet reflected all publishing costs that are fairly attributable to the shopper. Defendants admit that their method of cost accounting does not charge the Shoppers Guide with any portion of the company's fixed expenses or personnel costs.[10] They claim, how-

9. The same affidavit states that the Shoppers Guide showed a total profit of $1,476.-84 for the last 18 weeks of this period, projecting from this figure a future annual profit of $4,266.60. As plaintiff points out, however, the 18-week period defendants selected (Nov. 1, 1972, to Feb. 28, 1973) included the lucrative Christmas advertising season. The higher profit figure is there-

fore an unreliable index for projecting year-round revenues.

10. Defendants' affidavits and answers to plaintiff's interrogatories show that their figures include the cost of postage and carrier delivery, sales commissions on shopper advertisements, and the cost of newsprint, ink, electricity, and "materials." The figures do not include any portion of personnel

ever, that their accounting methods give a fair picture of the shopper's profitability because publishing the Shoppers Guide does not increase the fixed costs or personnel costs of the enterprise as a whole.[11] They also suggest that the Shoppers Guide has boosted the newspaper's revenue by attracting new subscribers and advertisers.

The record contains evidence supporting the positions of both parties. Each side has procured an accountant's opinion in support of the cost accounting method it favors. Depositions of defendants' employees furnish information about the amount of time each spends in producing the Shoppers Guide. Their testimony supports defendants' contention that getting out the shopper absorbs very little time in relation to the time spent publishing the daily newspaper, but it also supports plaintiff's argument that defendants could readily ascertain the portion of personnel time that the shopper consumes. The fact that the resulting reallocation would be small does not deprive this evidence of significance; defendants' low profit figures are vulnerable to even a slight increase in the costs allocated to the shopper.

The sum of this evidence presents an issue of disputed fact. It is not at all clear that defendants set the Shoppers Guide rates at a level that could reasonably be expected to generate a profit. Moreover, the ultimate question of defendants' intent depends on the credibility of its officers, who were also named as defendants. Even though the defendants' written protestations of good faith are convincing, the issue of intent should not have been resolved on summary judgment. *See* Poller v. CBS, Inc., 368 U.S. 464, 82 S.Ct. 486, 7 L.Ed. 2d 458 (1962); South Carolina Council of Milk Producers, Inc. v. Newton, 360 F.2d 414 (4th Cir.), cert. denied, 385 U. S. 934, 87 S.Ct. 295, 17 L.Ed.2d 215 (1966).[12]

Defendants contend, nonetheless, that summary judgment was proper because they furnished affidavits describing their good intentions while plaintiff supplied nothing more than "conclusory allegations" of predatory motive. Because Rule 56(e) provides that the party opposing a summary judgment motion may not rest on allegations in the face of contrary facts, defendants insist that plaintiff has created no material factual dispute on the crucial intent issue.[13] Plaintiff has no direct evidence of defendants' intent, but the deficiency is hardly surprising. Antitrust plaintiffs seldom have access to admissions of guilt and are often forced to rely on inferences arising from conduct. Proof that the Shoppers Guide is not paying its own way would support an inference that defendants' pricing policies were designed to drive the Advocate out of the market. Plaintiff has therefore produced enough evidence about the defendants' conduct to raise a factual issue about their intent. This is enough to preclude summary judgment.

Finally, defendants contend that the summary judgment may be affirmed on a ground not relied on by the district court. They interpret the record to establish as a matter of law that defend-

---

costs or "fixed costs of building, equipment and other facilities."

11. Defendants' insistence that the Shoppers Guide merely represents an additional use of equipment and facilities that would otherwise go unused seems at least slightly inconsistent with another of defendants' affidavits, which states that long-range planning for a shoppers guide was a factor in the building and expansion program undertaken by the Daily Reflector in 1969, and that additional equipment was ordered for that purpose.

12. To quote Mr. Justice Clark's now-classic language from Poller v. CBS, "summary procedures should be used sparingly in complex antitrust litigation where motive and intent play leading roles, the proof is largely in the hands of the alleged conspirators, and hostile witnesses thicken the plot." 368 U. S. at 473.

13. Fed.R.Civ.P. 56(e). The rule provides only that failure to furnish specific facts in response to a supported motion for summary judgment may result in granting the motion *if summary judgment is appropriate.*

ants lack the market power necessary for either a monopoly or an attempt to monopolize.[14] Plaintiff contends that the relevant market is printed advertising in and around Greenville. Defendants agree with the geographical bounds of the market, but would define the product market to include all forms of advertising, including radio and television. Using an estimate of the advertising volume that local television and radio stations sell to Pitt County merchants, defendants assert that the Daily Reflector sold only 23.34 percent of the total advertising dollar volume in 1970. These figures predate the inauguration of the shoppers guides and exclude incidental forms of advertising such as billboards, handbills and circulars, and the Yellow Pages. If, as plaintiff urges, the market is restricted to printed advertising, the Daily Reflector's 1970 share may be as high as 84 percent.[15] There is no evidence of the Daily Reflector's market share since 1970 or of the market share of either shoppers guide.

This evidence falls far short of establishing that defendants are entitled to judgment as a matter of law. The record does not show whether television and radio advertising are priced to compete with newspaper advertising. There is no comparison of the functions that the different media serve. *Cf.* Kansas City Star Co. v. United States, 240 F.2d 643, 658–660 (8th Cir.), cert. denied, 354 U.S. 923, 77 S.Ct. 1381, 1 L.Ed.2d 1438 (1957). Neither party has attempted to show whether merchants respond to price changes in one medium by switching to another. Defendants' deposition testimony to the effect that radio and television compete with the Daily Reflector and the shoppers guides for the "advertising dollar" in Pitt County is not enough. The "reasonable interchangeability" that defines competition for the purpose of market definition is more specific than the common definition of competition. *See* United States v. Grinnell Corp., 384 U.S. 563, 86 S.Ct. 1698, 16 L.Ed.2d 778 (1966); United States v. E. I. du Pont de Nemours & Co., 351 U. S. 377, 76 S.Ct. 994, 100 L.Ed. 1264 (1956).

*Combination, Conspiracy, and Contracts*

The district court's summary judgment also disposed of plaintiff's claims under section 1 of the Sherman Act. Construed liberally, the complaint alleges that David J. Whichard II, president, director, and stockholder of The Daily Reflector, Inc., was a party to a combination or conspiracy with the corporate defendant. The district court held that a corporation cannot be guilty of conspiring with its officers or agents, following the rule stated in Nelson Radio & Supply Co. v. Motorola, Inc., 200 F.2d 911 (5th Cir. 1952), cert. denied, 345 U.S. 925, 73 S.Ct. 783, 97 L.Ed. 1356 (1953). We agree with the general rule but think an exception may be justified when the officer has an independent personal stake in achieving the corporation's illegal objective. *See* America's Best Cinema Corp. v. Fort Wayne Newspapers, Inc., 347 F.Supp. 328, 332 (N.D. Ind.1972).[16] Whichard's deposition es-

---

14. Because the district judge ruled only on the allegation of an attempt to monopolize and concluded there was no specific intent to exclude competition, he found it unnecessary to define the relevant market or determine defendants' share of it.

15. This calculation is based on defendants' figures for the Daily Reflector and the weekly newspapers in Pitt County. It is unclear whether these figures include advertising sold by the Raleigh News and Observer, which publishes a weekly page of "Eastern Carolina" advertising. Defendants' deposition testimony suggests that the Raleigh paper's only sales to Pitt County merchants appear on this weekly page.

16. The Supreme Court's generous treatment of conspiracy allegations in Albrecht v. The Herald Co., 390 U.S. 145, 149–150, 88 S.Ct. 869, 19 L.Ed.2d 998 (1968), and Poller v. CBS, Inc., 368 U.S. 464, 82 S.Ct. 486, 7 L. Ed.2d 458 (1962), offer general support for this exception. *See also* ABA Section of Antitrust Law, Antitrust Developments 1955–1968, at 19 n. 84 (1968).

tablishes that he is affiliated with the Ayden News-Leader, a weekly newspaper in Pitt County, that he receives $5.-00 for each page it prints, and that if its advertising revenues should reach a certain level he would receive a percentage. Because the Ayden News-Leader sells advertising to Greenville merchants, it is reasonable to infer that Whichard could benefit personally from the elimination of The Advocate. These facts are sufficient to sustain plaintiff's allegations at this stage of the litigation. *See* Brett v. First Federal Savings & Loan Ass'n, 461 F.2d 1155 (5th Cir. 1972).

 Plaintiff's second theory under section 1 attempts to characterize the combination advertising contracts that defendants solicit from Pitt County merchants as contracts in restraint of trade. Because the combination rate offer is voluntary, we agree with the district court that it is not illegal per se as a tying arrangement. *See* Turner, The Validity of Tying Arrangements Under the Antitrust Laws, 72 Harv.L.Rev. 50, 67, 75 (1958); *cf.* FTC v. Sinclair Refining Co., 261 U.S. 463, 43 S.Ct. 450, 67 L.Ed. 746 (1923). A voluntary combination rate may still violate section 2 as an unreasonable restraint of trade if it is accompanied by a specific intent to restrain competition or if it has that effect. Times-Picayune Publishing Co. v. United States, 345 U.S. 594, 614–615, 73 S.Ct. 872, 97 L.Ed. 1277 (1953). The legality of the combination rate contracts in this case depends on the same facts required to establish an attempt to monopolize—the alleged cost justification for the reduced rate and the defendants' reasons for offering it. The disputed factual issues on plaintiff's major theory are material to this one as well, and defendants were not entitled to summary judgment.

Finally, defendants urge us to affirm the summary judgment on the ground that plaintiff has shown no causal connection between defendants' conduct and The Advocate's losses. This argument is premature on motion for summary judgment. South Carolina Council of Milk Producers, Inc. v. Newton, 360 F.2d 414, 419–420 (4th Cir. 1966).

Reversed and remanded.