**HOSPITAL BUILDING COMPANY, Appellant, Federation of American Hospitals, Amicus Curiae,**

v.

**TRUSTEES OF the REX HOSPITAL, a corporation, et al., Appellees.**

No. 73-1627.

United States Court of Appeals, Fourth Circuit.

Argued Oct. 3, 1974.

Decided Feb. 18, 1975.

John K. Train, III, and Timothy S. Perry, Atlanta, Ga. (Jordan, Morris & Hoke, Raleigh, N. C., and Alston, Miller & Gaines, Atlanta, Ga., and John R. Jordan, Jr., Raleigh, N. C., on brief), for appellant.

Carl Weissburg, Lawrence E. Mindell and Weissburg, Jacobs & Gerst, Los Angeles, Cal., on brief for amicus curiae Federation of American Hospitals.

Ray S. Bolze, Washington, D. C., and John H. Anderson, Raleigh, N. C. (Thomas W. Steed, Jr., Raleigh, N. C., John R. Fornaciari, Alexandria, Va., Allen, Steed & Pullen, and Smith, Anderson, Blount & Mitchell, Raleigh, N. C., Howrey, Simon, Baker & Murchison, Washington, D. C., Lillard H. Mount, Richard M. Hutson, II, and Hofler, Mount, White & Long, Durham, on brief), for appellees.

Before HAYNSWORTH, Chief Judge, BRYAN, Senior Circuit Judge, and WINTER, CRAVEN, BUTZNER, RUSSELL, FIELD, and WIDENER, Circuit Judges, sitting en banc.

CRAVEN, Circuit Judge:

In this action filed pursuant to sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 & 26, appellant Hospital Building Corporation (HBC) sought treble damages in excess of $2 million and injunctive relief for alleged violations of sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 & 2. The sole question before us is whether the district court erred when it dismissed HBC's amended complaint on the ground that it failed to allege a sufficient nexus with interstate commerce to invoke the Sherman Act.

I.

■ The motion to dismiss was lodged under Rule 12(b)(1) and (6) of the Federal Rules of Civil Procedure. Whether termed "lack of jurisdiction over the subject matter" or "failure to state a claim upon which relief can be granted," the result of such a motion, if granted, is the same. Dismissal under Rule 12, the lineal descendant of demurrer, is, of course, merely a decision on the pleadings. For that reason, such motions "are granted sparingly and with caution." 5 Wright & Miller, Federal Practice and Procedure § 1349, at 541. Especially is this so in antitrust cases "because it may be difficult to plead more precisely the effects on interstate commerce until discovery has been had." Chapiewsky v. G. Heileman Brewing Co., 297 F.Supp. 33, 38 (W.D.Wis.1968). Generally, we think that where a question of fact arises as to the substantiality of the impact of a local restraint on interstate commerce, the question should not be decided on a motion to dismiss. Donlan v. Carvel, 209 F.Supp. 829, 831 (D.Md.1962). Our task would be much simpler had the district court converted the motion to one for summary judgment as authorized by the last sentence of Rule 12(b). Such a course would doubtless have involved the district court and counsel in limited discovery procedures, but we think the extra time and effort would have been worthwhile.

■ Whether the complaint was dismissed for lack of subject matter jurisdiction or failure to state a claim upon which relief could be granted is not clear. Since Congress specifically has conferred jurisdiction of Sherman Act claims (15 U.S.C. §§ 15 & 26), we think

it the better analysis to treat an insufficient plea of effect upon interstate commerce as a failure to state a claim upon which relief can be granted rather than lack of jurisdiction (in the sense of power) over the subject matter. So viewed, our distaste for judgment on the pleadings is even greater, for a motion to dismiss for failure to state a claim "is viewed with disfavor and [should be] rarely granted." 5 Wright & Miller, *supra*, § 1357 at 598.

▮ Nevertheless, we have concluded to affirm. That we do so should be taken by the bar and the district judges as a rare exception to prove the rule that judgments of dismissal on the pleadings in antitrust cases will ordinarily be reversed.

## II.

HBC operates in Raleigh, North Carolina, a 49-bed proprietary hospital, Mary Elizabeth Hospital, which offers general medical-surgical hospital services to the public. The appellees, referred to by HBC in its brief and hereinafter by us as "the Raleigh Group," are a North Carolina corporation that runs a hospital in competition with Mary Elizabeth in Raleigh and various individuals involved in the provision of medical-surgical hospital services in Raleigh. HBC alleged below that, beginning at least as early as 1970 and continuing through the present, the Raleigh Group together with others not parties to this suit have engaged in a conspiracy aimed at controlling the number of hospital beds, allocating customers (hospital patients), and otherwise exercising unreasonable restraints of and monopolizing the market for medical-surgical hospital services in "the Raleigh area," defined as "the area comprising Wake County, in the State of North Carolina."

HBC professed to have discovered the conspiracy in late 1971 when it under-took to relocate Mary Elizabeth and expand it from 49 to 140 beds. According to HBC the Raleigh Group and their co-conspirators devised a scheme involving bad faith efforts to block authorization of the expansion,[1] tactics to hold up implementation of HBC's plans once authorization was gained, and finally malicious instigation of adverse publicity and general public antipathy. HBC alleged that the scheme has delayed expansion of Mary Elizabeth, and asked as damages treble the amount of direct costs and loss of revenue attributable to the delay. HBC also sought injunctive relief against a continuation of the alleged conspiracy. Because we conclude that the district court was correct in finding that even if HBC proved all of its factual allegations it still would have shown an insufficient connection with interstate commerce to invoke the Sherman Act, we affirm.

## III.

▮ An antitrust plaintiff may establish the necessary connection with interstate commerce in either of two ways: by demonstrating that the alleged anticompetitive conduct occurred *in* interstate commerce, or by showing that the conduct, though wholly intrastate, had a substantial *effect on* interstate commerce.

Greenville Publishing Co. v. Daily Reflector, Inc., 496 F.2d 391, 395 (4th Cir. 1974) (emphasis added). See also Goldfarb v. Virginia State Bar, 497 F.2d 1, 16 (4th Cir.), cert. granted, 419 U.S. 963, 95 S.Ct. 223, 42 L.Ed.2d 178 (1974) (No. 74–70); Sun Valley Disposal Co. v. Silver State Disposal Co., 420 F.2d 341, 343 (9th Cir. 1969); Lieberthal v. North Country Lanes, Inc., 332 F.2d 269, 271–72 (2d Cir. 1964). Within this traditional analytic framework the question for decision is whether the conspiracy described in HBC's complaint has either directly re-

---

**1.** At the time HBC sought authorization, North Carolina law required a certificate of need prior to hospital expansion. *See* In Re Certificate of Need for Aston Park Hosp., Inc., 282 N.C. 542, 193 S.E.2d 729 (1973), in which the requirement was held to violate the constitution of North Carolina.

strained *or* substantially affected interstate commerce.

## IV.

There is little basis for HBC's assertion that the alleged conspiracy acts directly in interstate commerce. The Raleigh Group is concerned exclusively with restraining Mary Elizabeth's provision of hospital services and with controlling the market for such services in the Raleigh area. The provision of hospital services has consistently been held to be a purely local activity. Elizabeth Hospital, Inc. v. Richardson, 269 F.2d 167, 170 (8th Cir.), cert. denied, 361 U.S. 884, 80 S.Ct. 155, 4 L.Ed.2d 120 (1959); Spears Free Clinic v. Cleere, 197 F.2d 125, 126 (10th Cir. 1952). Therefore, anticompetitive conduct aimed at the provision of such services necessarily acts *directly* only upon *intrastate* commerce. *See* United States v. Oregon State Medical Society, 343 U.S. 326, 338–39, 72 S.Ct. 690, 96 L.Ed. 978 (1952); Elizabeth Hospital, Inc. v. Richardson, *supra*; Riggall v. Washington County Medical Society, 249 F.2d 266, 268 (8th Cir. 1957), cert. denied, 355 U.S. 954, 78 S.Ct. 540, 2 L.Ed.2d 530 (1958); Spears Free Clinic v. Cleere, *supra*.

HBC's argument that the Raleigh Group's anticompetitive conduct occurred "in commerce" amounts to this: (1) Mary Elizabeth, and hospitals in general, have become substantially enmeshed in the interstate commerce network through their use of interstate communications facilities, their subjection to extensive federal regulation, their purchases of materials and services from out-of-state, their treatment of patients from other states, and their financial arrangements with national health insurers and government welfare programs; (2) the conspiracy directly affected Mary Elizabeth; therefore, the conspiracy, by acting upon a hospital so entwined in interstate commerce, acted directly upon interstate commerce. We accept the premises of the syllogism but reject the conclusion.

It is settled that the "in commerce" test is not whether the conduct complained of is aimed at a business engaged in interstate commerce, but whether the conduct complained of acts directly upon the interstate aspects of such a business. United States v. Yellow Cab Co., 332 U.S. 218, 230–34, 67 S.Ct. 1560, 91 L.Ed. 2010 (1947); Sun Valley Disposal Co. v. Silver State Disposal Co., *supra*, 420 F.2d at 343; Lieberthal v. North Country Lanes, Inc., *supra*, 332 F.2d at 271; Savon Gas Stations Number Six, Inc. v. Shell Oil Co., 309 F.2d 306, 308–09 (4th Cir. 1962), cert. denied, 372 U.S. 911, 83 S.Ct. 725, 9 L.Ed.2d 719 (1963); Page v. Work, 290 F.2d 323, 330 (9th Cir.), cert. denied, 368 U.S. 875, 82 S.Ct. 121, 7 L.Ed.2d 76 (1961). Here, no matter how entwined in our increasingly national economy Mary Elizabeth and other Raleigh area hospitals may be, the fact remains that the conspiracy complained of directly affected only one aspect of those hospitals' businesses, namely the provision of surgical-medical hospital services in the Raleigh area. And the provision of such services remains what it always has been: a local, intrastate activity, not interstate commerce.

In its argument that "in commerce" jurisdiction exists HBC relies heavily on language from Rasmussen v. American Dairy Association, 472 F.2d 517 (9th Cir.), cert. denied, 412 U.S. 950, 93 S.Ct. 3014, 37 L.Ed.2d 1003 (1973). We cannot see the relevance of that case to our situation for purposes of the "in commerce" test. The court in *Rasmussen* indicated, although it did not decide conclusively, 472 F.2d at 524–25, that the "in commerce" test was met by a restraint on the intrastate sale of a filled-milk product called "Go" which was manufactured in state from ingredients all but one of which originated out of state. The court was able to suggest that the restraint acted directly upon the flow of commerce formed by "Go" and its ingredients because—as the court said—"for all practical purposes, the out-of-state ingredients *are* 'Go.'" *Id.* at 525 (original emphasis). *Cf.* Mandeville Is-

land Farms, Inc. v. American Crystal Sugar Co., 334 U.S. 219, 68 S.Ct. 996, 92 L.Ed. 1328 (1948). Here, in contrast, there is no out-of-state product that is passed to patients in an economic transaction as a dominant ingredient of hospital services in the Raleigh area. Probably the only out-of-state products sold by Mary Elizabeth are drugs, and they are sold not so much as part of the interstate trade in drugs, but rather as a small and inseparable component of the *service* provided by Mary Elizabeth. This case is therefore different from Northern California Pharmaceutical Ass'n v. United States, 306 F.2d 379, 386–87 (9th Cir.), cert. denied, 371 U.S. 862, 83 S.Ct. 119, 9 L.Ed.2d 99 (1962), where the court found sales of drugs by pharmacies part of the interstate commerce flow of drugs: there, the drugs in their flow from manufacturer to ultimate consumer never lost their character as both a *product* and a distinct line of commerce.

## V.

It is not so easy to decide the result under the second, or "affecting commerce," branch of the analysis. Here the fact that the Raleigh Group's conduct acted directly only upon a local market and a local aspect of Mary Elizabeth's business is not dispositive. The question remains whether that conduct, though local in its immediate motive and effect, nevertheless so substantially[2] affects interstate commerce as to invoke the Sherman Act. That can only be a matter of degree, and such matters are never clear:

> There is no bright line dividing cases in which the effect upon interstate commerce is sufficient to permit Congress to prohibit particular anticompetitive activity under the commerce clause from those cases in which it is not sufficient. In this area perhaps more than in most, each case must turn on its own facts.

Rasmussen v. American Dairy Association, *supra*, 472 F.2d at 526.

HBC suggests several ways in which interstate commerce has been affected by the Raleigh Group's thwarting of the Mary Elizabeth expansion. Neither the hospital's interstate purchases of supplies and equipment,[3] its billings to national insurance companies and the federal government,[4] nor its purchases of management services from its parent corporation[5] have increased as they would

2. The volume, amount, or quantity of interstate commerce involved is irrelevant under the "in commerce" test, but may be crucial under the "affecting commerce" test. *See* Greenville Publishing Co. v. Daily Reflector, Inc., 496 F.2d 391 n. 6, 395 (4th Cir. 1974); Rasmussen v. American Dairy Ass'n, 472 F.2d 517, 526–28 (9th Cir.), cert. denied, 412 U.S. 950, 93 S.Ct. 3014, 37 L.Ed.2d 1003 (1973); Las Vegas Plumbers Merchant Ass'n v. United States, 210 F.2d 732, 739–40 n. 3 (9th Cir.), cert. denied, 348 U.S. 817, 75 S.Ct. 30, 99 L.Ed. 645 (1954); United States v. Richter Concrete Corp., 328 F.Supp. 1061, 1065–66 (S.D.Ohio 1971). As in other contexts, *see, e. g.*, United States v. LeFaivre, 507 F.2d 1288 (4th Cir. 1974), the Congress utilized its recognized power over commerce to reach detrimental activity. "The addition of the words 'or commerce among the several States' was not an additional kind of restraint to be prohibited by the Sherman Act but was the means used to relate the prohibited restraint of trade to interstate commerce for constitutional purposes . . . ." Apex Hosiery Co. v. Leader, 310 U.S. 469, 495, 60 S.Ct. 982, 993, 84 L.Ed. 1311 (1940). Thus if anticompetitive conduct occurs *in* commerce, to whatever degree, the Sherman Act is triggered. But if anticompetitive conduct occurs wholly *intra*state, Congress has left to the courts to decide whether such conduct "is sufficiently related to interstate commerce to justify the prohibition of that conduct as 'necessary and proper' to the protection of interstate commerce against the presumed economic burdens resulting from the anticompetitive practices." Rasmussen v. American Dairy Ass'n, *supra*, 472 F.2d at 524.

3. Mary Elizabeth's purchases totalled $112,-846 in 1972, 80 percent of which sum was paid pursuant to national contracts negotiated by HBC's parent corporation.

4. Such billings represented approximately 95 percent of Mary Elizabeth's total billings in 1972.

5. $36,000 in 1972. HBC's parent corporation was incorporated and is located outside of North Carolina, so that the purchase of services can be deemed interstate.

were the hospital to expand. And the $4 million cost of expansion was to be financed by non-North Carolina lenders, so that substantial interest payments would flow across state lines.

■ Aware that such decisions should be exercises of reasoned economic judgment rather than applications of mechanistic formulae, *see* Rasmussen v. American Dairy Association, *supra*, 472 F.2d at 523, we conclude that the various ramifications noted by HBC do not add up to a sufficiently substantial effect upon interstate commerce to satisfy Sherman Act requirements. The effect here seems to us the indirect and fortuitous consequence of the restraint of the intrastate Raleigh area hospital market, rather than the result of activity purposely directed toward interstate commerce.[6] Although not controlling, this factor is relevant to the issue of substantiality. *See, e. g.*, Spears Free Clinic v. Cleere, *supra*, 197 F.2d at 127; Marston v. Ann Arbor Property Managers (Management) Association, 302 F.Supp. 1276, 1280 (E.D.Mich.1969), aff'd per curiam, 422 F.2d 836 (6th Cir.), cert. denied, 399 U.S. 929, 90 S.Ct. 2244, 26 L.Ed.2d 796 (1970). Moreover, when the various economic consequences are sorted out and considered in the perspective of their respective markets,[7] it is obvious that none of them could have more than negligible impact: no source of supply or insurance company or lending institution can be expected to go under if Mary Elizabeth doesn't expand, and no market price likely will be affected. In short, we are unconvinced that the alleged conspiracy, even if successful, can affect interstate commerce in the detrimental manner that concerned Congress when it passed the Sherman Act. *Cf.* Page v. Work, *supra*, 290 F.2d at 332–33.

In deciding that there is here insufficient impact on interstate commerce to invoke the Sherman Act we do not overlook Doctors, Inc. v. Blue Cross of Greater Philadelphia, 490 F.2d 48 (3d Cir. 1973). The Third Circuit in that case found jurisdiction over an alleged conspiracy of Blue Cross and a hospital planning agency aimed at manipulating the Greater Philadelphia hospital services market to Blue Cross's benefit. The court based its finding on the fact that the conspiracy, if successful, could shut down many of the approximately 100 hospitals in the Greater Philadelphia area, which could affect as much as $23 million per year in interstate shipments of supplies. According to the court, and we agree, this potential effect upon the traffic in out-of-state goods was "substantial enough" to invoke the Sherman Act. 490 F.2d at 53.

We think *Doctors, Inc.* is distinguishable. There is simply no significant comparison between the effect on commerce of one small hospital's delayed expansion, especially when other hospitals contemplate expansion, and the vastly greater effect of the possible closing of a significant percentage of the hospitals in a metropolitan area. The *Doctors, Inc.* court carefully distinguished its situation from Lieberthal v. North Country Lanes, Inc., *supra*, and Page v. Work, *supra*, referring to them as "good law" and "the kinds of cases which remain beyond the reach of interstate commerce juris-

---

6. An example of anticompetitive conduct that is aimed at a local market and yet directly and purposefully affects interstate commerce is that in United States v. Frankfort Distilleries, Inc., 324 U.S. 293, 65 S.Ct. 661, 89 L.Ed. 951 (1945). Liquor dealers in Colorado conspired to fix retail liquor prices within the state, a purely local aim. But as a means of accomplishing their purpose they agreed both to compel out-of-state liquor producers to enter into fair trade contracts and to boycott those producers who failed to do so. The Supreme Court in finding Sherman Act jurisdiction focused upon this tactic of the con-

spirators, stating that "[w]hatever was the ultimate object of this conspiracy, the means adopted for its accomplishment reached beyond the boundaries of Colorado." 324 U.S. at 298, 65 S.Ct. at 664.

7. *Cf.* Rasmussen v. American Dairy Association, 472 F.2d 517, 527 (9th Cir.), cert. denied, 412 U.S. 950, 93 S.Ct. 3014, 37 L.Ed.2d 1003 (1973); "The basic issue . . . is the extent to which a prohibition of the defendants' specific conduct is justifiable as a means of protecting *the specific line of interstate commerce involved*." (emphasis added).

diction." 490 F.2d at 54. We agree and conclude that this case resembles *Lieberthal* and *Page* more than *Doctors, Inc.*[8]

Having quite plausibly, we think, fit this case into its appropriate pigeonhole entitled "nonsubstantial or de minimis effect on interstate commerce," we are left with a feeling of dissatisfaction. Labeling one case "de minimis" and another as "affecting commerce" does achieve a result but is not otherwise very revealing. Anyone who studies decisions applying the "affecting commerce" test will be struck by the absence of a clear line, much less a bright one, between those effects that are deemed substantial and those that are characterized as "indirect," or "fortuitous," or "insubstantial," or "de minimis," or "sporadic," or "incidental." In any area so very gray it is absurd to suppose that we or any other court can precisely count up the tons of plaster, bottles of liquor, or quantity of proprietary drugs sufficient to cross the line of substantiality. Increasingly, intrastate economic conduct affects interstate commerce due to the interdependence of all segments of our national economy. Whether or not "de minimis" has ever been an effective litmus for application of the Sherman Act, we doubt that it now is, and we are concerned that conventional impact analysis may sometimes conceal rather than reveal the true rationale of decision.

Rather than attempt a quantitative measurement of interstate involvement, we should, perhaps, consider instead the real danger, in a practical sense, of anticompetitive conduct to the flow of commerce, or the potential destructive power of a conspiracy. It seems to us that courts have been doing that for a long time without necessarily saying so. Such an approach is implicit in the format and choice of words of Mr. Justice Black in United States v. Employing

Plasterers Ass'n, 347 U.S. 186, 74 S.Ct. 452, 456, 98 L.Ed. 618 (1954). The opinion runs only three pages. The approach is a sweeping one suggesting indignation that a local group of people were "able to *dictate* who could and who could not buy plastering materials that had to reach Illinois through interstate trade if they reached there at all." 347 U.S. at 189, 74 S.Ct. at 454 (italics added). Such restraints are characterized as capable of causing "unreasonable burdens on the free and uninterrupted flow of plastering materials into Illinois." *Id.* Notable by its absence is any quantitative analysis. Omitted is any detailed narrative of the type of commerce involved. Instead there is simply a note of impatience that any district judge could possibly have dismissed a Sherman Act complaint that alleged defendants' power to *control* the intrastate market.

Similarly, in Burke v. Ford, 389 U.S. 320, 88 S.Ct. 443, 19 L.Ed.2d 554 (1967), the Supreme Court peremptorily reversed a court of appeals in a two-page per curiam. The economics of the case and description of the commerce involved were reduced to a footnote. The Court focused not on how many bottles of bourbon went from place to place but on its apprehension that this *intra*state conspiracy would "invariably reduce competition" and cause a price increase. 389 U.S. at 321, 88 S.Ct. 443.

The evil of monopoly power is the theme of both *Employing Plasterers* and *Burke.* Not one word is said about whether the anticompetitive conduct substantially *or* insubstantially affects interstate commerce.

In our case there is no allegation that the Raleigh Group has the power to put HBC out of business, or indeed, upon a fair reading of the whole amended complaint, that it can do any more than delay, at most, whatever expansion seems

---

8. In *Lieberthal* the conspiracy was aimed at preventing the opening of one bowling alley, as here it is aimed at preventing expansion of one hospital. In *Page* the court found that a conspiracy to control legal advertising in a local market would not substantially affect commerce in newsprint and other products, since by far the major consumers of such products remained untouched by the conspiracy; here, as noted in the body, the failure of Mary Elizabeth to expand could have no noticeable detrimental effect on the various lines of commerce suggested by HBC.

economically wise to the plaintiff. In *Doctors, Inc.*, on the other hand, the plaintiffs alleged that defendants had the power to shut down a hundred hospitals. Thus the real difference between our case and *Doctors, Inc.* may be not so much the quantitative difference in effect on interstate commerce as the dramatic difference in anticompetitive *power*—the danger Congress sought to guard against. Viewed in such a manner the cases seem more persuasively different than if simply stuffed into their respective pigeonholes of insubstantial and substantial impact on interstate commerce.

Affirmed.

## ADDENDUM

On December 17, 1974, after the preparation of the opinion in this case, the Supreme Court released its decision in Gulf Oil Corp. v. Copp Paving Co., 419 U.S. 186, 95 S.Ct. 392, 42 L.Ed.2d 378. Mr. Justice Powell's opinion for the Court notes that the grant of certiorari was limited to questions arising under the Clayton and Robinson-Patman Acts. What is said about the Sherman Act, by way of comparison with those Acts, is not new, at 194, 195, 95 S.Ct. 398. Although dictum as to the Sherman Act, we think language on pages 198, 199, 95 S.Ct. on page 400 is consistent with our belief that problems of application of trade control statutes cannot be solved by counting units of merchandise.

> The justification for an expansive interpretation of the "in commerce" language, if such an interpretation is viable at all, must rest on a congressional intent that the Acts reach all practices, even those of local character, harmful to the national marketplace. This justification, however, would require courts to look to practical consequences, not to apparent and perhaps nominal connections between commerce and activities that may have no significant economic effect on interstate markets.

WINTER, Circuit Judge (dissenting):

Although I concurred in the panel decision affirming the district court's dismissal of the amended complaint for failure to allege a sufficient nexus with interstate commerce to sustain a cause of action under the Sherman Act, I am now persuaded that the holding was incorrect. In my view, this amended complaint may not be dismissed *on the pleadings*. Of course, I express no view as to whether the jurisdictional allegations can be proved, but plaintiff should be afforded the opportunity to establish them, if not at trial, at least by a *prima facie* showing to defeat any motion by defendants for summary judgment. I therefore dissent from the majority's affirmance of the district court's dismissal of the amended complaint under Rule 12, F.R.Civ.P.

### I.

The amended complaint alleges that the action is brought to redress actions of the defendants which constitute "(1) a combination and conspiracy in restraint of trade in violation of Section 1 of the Sherman Act and (2) an attempt to monopolize in violation of Section 2 of the Sherman Act. . . ." Before the specific allegations of fact to support these jurisdictional assertions are considered, it is well to consider the scope of application of the Sherman Act. What combinations and conspiracies in restraint of trade and what attempts to monopolize does the Sherman Act prohibit?

There is no novelty in the answer. The settled law was recently restated in Gulf Oil Corporation v. Copp Paving Company, Inc., 419 U.S. 186, 95 S.Ct. 392, 42 L.Ed.2d 378 (1974). See also Greenville Publishing Co., Inc. v. Daily Reflector, Inc., 496 F.2d 391, 395–96 (4 Cir. 1974). *Gulf Oil* was a case which turned on the jurisdictional requirements of § 2(a) of the Robinson-Patman Act and §§ 3 and 7 of the Clayton Act. It held that intrastate sales of asphalt for use in the construction of interstate highways were not sales "in commerce"

within the ambit of the two Acts. In arriving at this result, the Court reviewed the jurisdictional scope of the two Acts and compared them with the jurisdictional scope of the Sherman Act.[1]

The Court contrasted the "in commerce" concept of the Robinson-Patman Act and the Clayton Act with the jurisdictional scope of the Sherman Act, saying:

> This "in commerce" language differs distinctly from that of § 1 of the Sherman Act, which includes within its scope all prohibited conduct "in restraint of trade or commerce among the several States, or with foreign nations. . . ." *The jurisdictional reach of § 1 thus is keyed directly to effects on interstate markets and the interstate flow of goods.* Moreover, our cases have recognized that *in enacting § 1 Congress "wanted to go to the utmost extent of its Constitutional power in restraining trust and monopoly agreements. . . ."* United States v. South-Eastern Underwriters Association, 322 U.S. 533, 558, 64 S.Ct. 1162, 1176, 88 L.Ed. 1440 (1944). Consistently with this purpose and with the plain thrust of the statutory language, the Court has held that, *however local its immediate object, a "contract, combination . . . or conspiracy" nonetheless may constitute a restraint within the meaning of § 1 if it substantially and adversely affects interstate commerce.* E. g., Mandeville Island Farms, Inc. v. American Crystal Sugar Co., 334 U.S. 219, 234,

68 S.Ct. 996, 1005, 92 L.Ed. 1328 (1948). "If it is interstate commerce that feels the pinch, it does not matter how local the operation which applies the squeeze." United States v. Women's Sportswear Manufacturing Association, 336 U.S. 460, 464, 69 S.Ct. 714, 93 L.Ed. 805 (1949). (Emphasis in text added.) 419 U.S. at 194, 95 S.Ct. at 398.

With the standard of what the Sherman Act encompasses so clearly defined, I have no hesitancy in concluding that plaintiffs have alleged a sufficient adverse *effect* on interstate commerce to confer jurisdiction on the district court to decide the case on its merits.[2] Under *Gulf Oil*, the test is one of congressional power, and the question is whether Congress could reach the alleged conduct under the commerce power. This is the clear meaning of the statement that ". . . Congress 'wanted to go to the utmost extent of its Constitutional power' . . . ." The majority holds in effect that the alleged activity is too tenuously related to interstate commerce in a practical sense to justify federal regulation for antitrust reasons. In reaching this conclusion, the majority opinion, as its addendum demonstrates, applies a test designed for determining the jurisdictional ambit of the Clayton and Robinson-Patman Acts. *Gulf Oil*, however, teaches that this test is inappropriate for actions brought under the Sherman Act. In any event, the majority's conclusion is based upon determinations of: (1) the quantitative impact on interstate commerce of the alleged con-

---

1. The Court noted that § 2(a) of the Robinson-Patman Act forbids "any person engaged in commerce, in the course of such commerce" to make price discriminations "where either or any of the purchases involved in such discrimination are in commerce" and where the effect of the discrimination is to suppress competition "in any line of commerce." It also recited that § 3 of the Clayton Act renders unlawful tie-in sales or exclusive dealing arrangements by "any person engaged in commerce" where the effect "may be to substantially lessen commerce or create a monopoly in any line of commerce," and that § 7, forbidding certain acquisitions, similarly applies to acquirers engaged "in com-

merce" and prohibits them from acquiring the stock or assets of another corporation engaged "in commerce" where the effect may be substantially to lessen competition "in any line of commerce in any section of the country." It concluded that application of both Acts turned on the concept of "in commerce," defined in § 1 of the Clayton Act as "trade or commerce among the several States and with foreign nations . . . ."

2. Of course, if the rendition of local hospital services was "in commerce," the Sherman Act would clearly apply. But no court has so held, and I think that the majority's conclusion that HBC's activities are not "in commerce" is a correct one.

duct, assessed in terms of precedent sustaining and rejecting complaints, and (2) the qualitative importance of the anticompetitive power alleged in the complaint. By both, I think that proper application of the Sherman Act can be demonstrated.

## II.

As the majority opinion states, the conspiracy in which defendants allegedly engaged was to prevent Hospital Building Company (HBC) from expanding the capacity of its proprietary Mary Elizabeth Hospital in Raleigh, North Carolina, from 49 to 149 beds. HBC is a wholly-owned subsidiary of Charter Medical Corporation (Charter), which has its principal office in Macon, Georgia, and which, by contract, provides management services to HBC for a fee, including the negotiation of contracts for the purchase of hospital supplies. Suppression of the expansion, it was charged, was to enable defendants to reduce competition in local hospital services by HBC and to enable defendants to control the local hospital service market and thus to allocate it among themselves.

HBC averred that the alleged conspiracy had the following effects on interstate commerce:

(1) It purchases approximately 80% of its supplies and medicines from vendors in states other than North Carolina. In 1972, excluding food and supplies for its kitchen, it purchased $112,846 of supplies for its radiology, medical laboratory, and electrocardiology operations and its pharmacy. If the hospital were enlarged from 49 to 149 beds, such purchases in interstate commerce would not only continue but increase substantially.

(2) It regularly uses interstate communication, including the mails, to carry out its operations. It pays Charter a fee under the management contract with it. The fee is based on gross receipts, and for 1972 the fee was approximately $36,000. If the hospital were expanded, the amount of the fee would increase substantially.

(3) The fees for hospital services and charges for many of the patients at the existing hospital are paid by insurers and other providers outside of North Carolina. Although not alleged, it may be inferred that if the hospital were expanded fees paid by out-of-state providers would increase substantially.

(4) If the hospital were increased from 49 to 149 beds, the cost thereof would exceed $4,000,000. That cost would be financed by one or more loans with one or more lenders located outside of North Carolina. Payment of principal and interest would extend substantially into the future, and it would require regular remittances to a lender outside of North Carolina.

Conclusorily, HBC alleged that the combination and conspiracy which it charged has "a substantial and direct effect on interstate commerce." I agree. The allegations establish the suppression of an interstate cash flow that would be both substantial and continuing. *Cf.* Lieberthal v. North Country Lanes, Inc., 332 F.2d 269 (2 Cir. 1964). I therefore am of the view that jurisdiction was alleged to exist in accord with the test reiterated in *Gulf Oil.*

## III.

Doctors, Inc. v. Blue Cross of Greater Philadelphia, 490 F.2d 48 (3 Cir. 1973), as the majority points out, is a stronger case than the instant one for concluding that the alleged conspiracy had a substantial effect on interstate commerce and that the Sherman Act applied. In *Doctors,* the named plaintiff purchased $233,430 in supplies from out-of-state suppliers in the test year. Although this figure does not seem to be of any greater magnitude than the projected flow alleged by the plaintiff here, the majority relies on the fact that Doctors' Hospital was typical of the approximately one-hundred other hospitals in the area against all of which the conspiracy was directed, so that it could properly be inferred that interstate purchases of great magnitude were jeopardized. The dis-

tinction, however, is largely without difference. *Gulf Oil* reminds us that, in enacting § 1 of the Sherman Act, Congress was exercising to the *fullest extent* its constitutional power to restrain trusts and monopolies. Thus, it is not only the "big" resultant restraint on interstate commerce that it outlawed; the "little" resultant restraint on interstate commerce is outlawed too so long as a direct adverse effect on interstate commerce is demonstrated and that effect is not *de minimis*.

To be more specific, in *Doctors* the argument was advanced, as urged by the defendants here, that the object of the conspiracy was the intrastate activity of the rendition of hospital services and the effect on interstate commerce was indirect and insubstantial, so that the Sherman Act was inapplicable. In *Doctors*, the argument was rejected in terms which make that case a relevant and persuasive authority for reversing the district court in the instant case. Analyzing Burke v. Ford, 389 U.S. 320, 88 S.Ct. 443, 19 L.Ed.2d 554 (1967), and United States v. Employing Plasterers Ass'n, 347 U.S. 186, 74 S.Ct. 452, 456, 98 L.Ed. 618 (1954), the Third Circuit pointed out that in both the Supreme Court found that a sufficient effect on the flow of out-of-state supplies to local businesses had been alleged to confer Sherman Act jurisdiction. 490 F.2d at 52. More importantly, "there [was not] even a concern with the specific magnitude of the impact on interstate commerce caused by the alleged conspiracy. Instead, the Court in each case ends its inquiry when it has satisfied itself that the logical and therefore probable effect of the alleged act is to reduce the flow of goods in interstate commerce." 490 F.2d at 53.

I recognize and accept that there are instances in which the effect on interstate commerce of anticompetitive conduct aimed at local activities may be too insubstantial to invoke Sherman Act jurisdiction. Lieberthal v. North Country Lanes, Inc., 332 F.2d 269 (2 Cir. 1964) (the one-time equipping of a new local bowling alley), and Page v. Work, 290 F.2d 323 (9 Cir. 1961) (alleging conspiracy to control legal advertising, thus causing a newspaper specializing in such advertising to sell its assets to another publisher who continued the paper and continued to buy the same quantity of newsprint from out-of-state sources), are good examples. But the instant case is more like *Doctors* than *Lieberthal* and *Page*. If HBC were permitted to expand, its purchases in interstate commerce and its other interstate activities would increase. It follows that an alleged conspiracy to prevent its expansion has an adverse effect on interstate commerce—not *de minimis*—and should be held to support jurisdiction under § 1 of the Sherman Act.

### IV.

Similarly, I view the anticompetitive power alleged here as substantial. In essence the plaintiffs allege that a local conspiracy was able to forestall out-of-state entry into the local hospital market. If by means of conspiracy and harassment those who hold a local market can foreclose or limit the entry of competition, capital, and initiative from out-of-state, then it seems to me that the federal interest in interstate commerce is directly involved. To conclude, as the majority does, that the plaintiffs here do not allege the kind of anticompetitive power which "Congress sought to guard against" is merely to disbelieve the plaintiff's allegations. In the Sherman Act, not only the "evil of monopoly power," but the evil of improper attempts to achieve it are condemned. Where, as here, the out-of-state plaintiffs suggest that local official power and processes were used to delay and deter them, the plaintiffs implicate not only antitrust policy as such, but also the "national market" concerns which animate the commerce clause itself.

HBC's allegations about the flow of financing, management services, and supplies to the hospital from out-of-state have been stated. Additionally, HBC

alleges that the overwhelming majority of the fees paid to it come from the federal government and from out-of-state providers. Money thus flows from Blue Cross, private insurers, and the federal government to the hospital and thence to out-of-state suppliers, managers, and financiers. While this construction of the facts may not put HBC's provision of hospital services in the "flow" of commerce as that term is used in the case law, it does make it graphically clear that if HBC is affected, a wide range of interstate connections is affected.

There is, furthermore, a clear and significant federal interest in at least one of these connections—the interstate flow of medicare and medicaid payments, and more generally with the costs of medical care in Wake County. Actual or attempted monopolization of the local market could have a dramatic effect, not only to decrease the flow of hospital payments, but to increase the cost of hospital care in the Raleigh area as well. If hospital care costs are increased, insurance costs will also increase, and federal and out-of-state providers will spread these increased costs beyond the local area in which they are incurred. And this is so even if the overall market for hospital care in the Raleigh area is neither increased nor diminished, but only concentrated in the hands of the hospital defendants.

Under all these circumstances, I think it myopic to maintain that the service itself is rendered locally. Local patient care may be the hub of hospital operation, but the spokes—financing, supplies, management, and fee payments—all have out-of-state implications. The hub cannot be braked without affecting the spokes.

Judge BUTZNER and Judge FIELD authorize me to say that they, too, dissent and concur in this dissenting opinion.